# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-05-00034-CV

**Thomas O. Bennett, Jr. and James B. Bonham Corporation, Appellants**

**v.**

**Randy Reynolds, Appellee**

### FROM THE DISTRICT COURT OF SAN SABA COUNTY, 33RD JUDICIAL DISTRICT
### NO. 8027, HONORABLE V. MURRAY JORDAN, JUDGE PRESIDING

### O P I N I O N

Thomas O. Bennett, Jr., and the James B. Bonham Corporation each appeal a judgment awarding Randy Reynolds $5,327.11 in actual damages, imposed jointly and severally against them, plus punitive damages of $250,000 from Bennett and $1 million from Bonham Corporation. The judgment was based on jury findings that Bennett, the president of Bonham Corporation, and the corporation itself converted cattle owned by Reynolds having a reasonable cash value of $5,327.11; that each acted with malice; and that each committed felony theft. Bennett and Bonham Corporation each challenge the legal and factual sufficiency of the evidence supporting various jury findings. Each also contends that the amounts of the punitive damage awards—almost 47 times the actual damages award as to Bennett and almost 188 times actual damages for Bonham Corporation—exceed the "substantive" limitations of the Due Process Clause. *See State Farm Mut.*

*Auto Ins. Co. v. Campbell*, 538 U.S. 408, 417-18 (2003); *BMW of N. Am. v. Gore*, 517 U.S. 559, 568 (1996); *Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 307-08 (Tex. 2006).

As we explain below, we find that the controlling jury findings challenged by the appellants are supported by legally and factually sufficient evidence. Further, based on the somewhat unusual record in this case, the punitive damages awards do not exceed due process limitations. For these reasons, we will affirm the judgment.

## BACKGROUND

We will fully detail the evidence as it becomes relevant to our analysis of the appellants' issues. To provide some basic factual and procedural context, the principal underlying events occurred in northern San Saba County on properties situated along the Colorado River, which carves the county's boundary with Mills County. As it has long been, cattle ranching continues to be a common activity in this area.

Several witnesses acknowledged, and none disputed, that the respective rights of cattle ranchers and landowners in San Saba County are governed in part by an "open range" law. Simply put, cattle owners are not obligated to fence in their cattle, and any individual landowners who do not want stray cattle grazing on their vegetation, trampling things underfoot, or causing other damage commonly associated with these large livestock have the burden of fencing *out* cattle.

The evidence reflected that although landowners or ranchers in this area typically maintain barbed-wire fencing to confine their cattle or keep out strays, it is not uncommon for cattle to escape fenced areas and wander onto other properties. In particular, some areas along the Colorado River are not fenced, the landowners relying solely on the river and related topography to

2

provide a natural barrier to cattle. During dry spells, however, the river can recede to an extent that cattle it otherwise confines can escape by wandering into and along the dried river bed. Although escaped cattle are sometimes never seen again, they often are later located on other properties along the river. In such instances, the precise manner of recovering the cattle or returning them to their rightful owner is a matter ordinarily worked out among the neighbors involved in light of their relationship and past dealings.

This case involves one of those dry spells along the Colorado, stray cattle, and a rather hostile relationship between two neighbors.

**Reynolds's missing cattle**

It was undisputed that during the summer and fall of 2000, drought conditions caused the Colorado River to dry up, allowing cattle to escape some properties along the river. One of those properties was a 320-acre pasture abutting the Colorado near the historic Regency suspension bridge that Randy Reynolds, appellee, leased from Mrs. Willie Mae Locker. Reynolds had been married to Mrs. Locker's daughter, Bobbie Lee, until Bobbie Lee's 1998 death. Reynolds had begun leasing the property from Mrs. Locker following the 1987 death of his father-in-law, Lloyd Locker; he also purchased most of Mr. Locker's cattle at that time.

Having previously lost cattle from the Locker property when the Colorado dried up,[1] Reynolds testified that while checking on his cattle, he had been watching the "holes" in fencing

---

[1] Reynolds claimed that he had cattle similarly escape the Locker property fifteen or sixteen times by time of trial. While he recovered most of these cattle, he never recovered four cow-calf pair who escaped in 1998 and two bulls who escaped in 2001.

3

created as the river receded. "About a week went by and I didn't get down there," Reynolds recounted. When he checked on the cattle again—which he placed in mid-October 2000 or "a week or so after the first part of October"—Reynolds discovered 23 head of his cattle missing. He claimed that he last saw the missing cattle on October 1.

After discovering his cattle missing, Reynolds explained that he called "all the neighbors up and down the river as we always do" to try to locate them. He also indicated that, sometime in mid-October, he walked the riverbed looking for his cattle, tracked them along the muddy and sandy surface through a "hole" where the cattle had avoided the fencing along the east boundary of the Locker property, downstream past some other properties, and ultimately up the riverbank toward an open gate. The gate led into the main portion of an approximately 914-acre property that, while identified on the front gate as the "Bennett Ranch," was owned by the Bonham Corporation, appellant. Other portions of the Bennett Ranch also extended to Farm Road 500 and shared a common fence line with the southern boundary of the Locker property.

The Bonham Corporation's articles of incorporation state its purposes as "construction and repair of buildings; development of property; and all related contracts permitted by law." Bennett, appellant, is the corporation's president and registered agent. According to Bennett, the Bonham Corporation bought land to improve, subdivide into smaller tracts, and resell. Bennett testified that he had formed Bonham Corporation in 1975 "to put some stuff in it for [his] daughters," and he introduced what purported to be stock certificates reflecting that his two daughters each owned half of the corporation's stock. Bennett, on behalf of the corporation, had acquired the property in San Saba County through a series of purchases between 1990 and 1995. The

4

corporation also owned a spread of over 3,800 acres in Navarro County in or near Corsicana, and had land holdings in several other Texas counties. The corporation owned houses on both the Bennett Ranch and its Corsicana property,[2] where Bennett was permitted to live rent-free.[3] Among other duties as corporation president, Bennett hired, directed and paid ranch hands, whose duties on the Bennett Ranch included building cattle guards, pens, and fencing, and repairing farm, ranch, and irrigation equipment. As Bennett described his authority and duties, "I run that ranch," "I make the decisions," and "I take care of my daughters' interests." Bennett also ran cattle on the Bennett Ranch—though he insisted that these activities were purely personal and unrelated to his corporate duties.

By October 2000, Reynolds and Bennett already had an adversarial history—rooted in a disagreement over a fence—and had not spoken since 1999. In 1996, while driving, Reynolds saw Bennett and others working on a fence, stopped, and had a conversation with Bennett.[4] The two gave conflicting accounts of this encounter. Reynolds testified that Bennett and his crew were bulldozing the pre-existing fence along the boundary dividing the Locker property and the Bennett Ranch. Reynolds claimed that he had not previously been advised of any plans by Bennett to demolish or replace the existing fence. Thinking such an action less than neighborly, Reynolds

---

[2] Although both properties had "Bennett Ranch" signs out front, for simplicity and clarity we will use the term to designate only the San Saba County property.

[3] Former ranch worker Larry Grant, whose extensive involvement in the underlying events is summarized below, described the corporation-owned house on the Bennett Ranch as a "[d]ouble-wide mobile home put on stilts," while the house on the Corsicana property was "a big old brick home."

[4] Reynolds testified that he had first met Bennett in 1995.

5

stopped to inquire of Bennett "what was going on, what he was doing." According to Reynolds, Bennett explained that he was going to rebuild the fence anyway and asked whether Reynolds would pay half of the cost. Reynolds claimed that he told Bennett, "no, it's not my land," and that he couldn't afford to pay for the fence anyway, but that he would inquire with Mrs. Locker, who owned the land, to see if she could help. Reynolds testified that Mrs. Locker couldn't help at the time, and that he so advised Bennett. Reynolds explained, however, that he did offer to provide labor on the fence once he returned from an extended work trip to Alaska for which he was leaving the next day. By the time Reynolds returned five weeks later, he testified, the fence had already been completed.

Bennett, in contrast, claimed that his crew had been working on a Bennett Ranch fence other than the one bordering the Locker property, that Reynolds had offered to pay half of the cost if Bennett would also have replaced the fence along the Locker property boundary, and that Bennett proceeded to replace the fence. Bennett testified that the fence was constructed by Bonham Corporation, with corporation employees and materials.

Sometime in 1998, Reynolds recounted, Bennett "called me one night" and "wanted me to pay half the fence." Reynolds declined, telling Bennett, "I didn't feel like I owed him for half the fence." Subsequently, in 1999, Reynolds had what he termed a "very unpleasant" exchange in Bennett's office at his house on the Bennett Ranch. Reynolds's wife Bobbie Lee had died in 1998 and, by this time, Reynolds was in a romantic relationship with a Bonham Corporation worker, and had accompanied her to the office to pick up her final check. A dispute arose concerning money Bennett claimed he was owed for damage the worker had allegedly caused to a pickup owned by Bennett or the corporation. According to Reynolds, "[a]fter they concluded their business, [Bennett]

6

asked me when I was going to pay him for the fence, and I again told him that I didn't owe him for any fence." Then, Reynolds testified, Bennett called him "a lot of names," including "liar," whereupon Reynolds and the worker left.[5]

Despite this history, Reynolds claimed that as he was searching for his missing cattle in October 2000, he tried unsuccessfully to contact Bennett by phone and by looking for Bennett at his house on the Bennett Ranch. Subsequently, in November 2000, Reynolds testified that he noticed some of his missing cattle on the Bennett Ranch near Farm Road 500, drove in, and managed to recover five cattle—four cows and a nursing calf. A few days later, Reynolds claimed he spotted his missing bull on the Bennett Ranch, again entered, and attempted to recover the bull, which ran away. Within a few more days, however, Reynolds saw the bull again, made a second effort to recover him, and was successful. Reynolds denied that he ever took any of Bennett's cattle out of the Bennett Ranch, adding that he had cut out a calf that he was less than certain was his.

Reynolds testified that he never recovered any more of his missing cattle. Eventually, sometime in December 2000, Reynolds began attempting to make contact with Jack Andrews, the regional field supervisor of the Texas and Southwestern Cattle Raisers Association (TSCRA).[6]

---

[5] Grant testified that "Tom set that up" to "get Mr. Reynolds in the office and was going to tape record him and try to get something on him about the fence." Grant explained, and Bennett later admitted, that Bennett would sometimes tape-record conversations with other people, concealing a small tape recorder in a shirt or jacket pocket. Bennett, Grant recounted, had asked him to be present as a witness during his staged provocation of Reynolds. Grant stated that Bennett brought up the subject of the fence, "[t]hey got in an argument about it," and it "got pretty heated."

[6] The TSCRA is an organization comprised of cattle producers and operators located primarily in Texas and Oklahoma. Among other services, the TSCRA provides livestock theft investigators who are commissioned as Special Rangers by the Texas Department of Public Safety, as well as market inspectors who identify and report cattle sold in Texas's livestock markets to TSCRA's Fort Worth headquarters, where the information is entered into a database and made available to law enforcement agencies nationwide.

7

They did not meet until January 4, 2001.[7] Reynolds reported to Andrews that he had seven cows and nine calves missing, and requested Andrews to check TSCRA records to see if any cattle with his brand had been sold recently. Andrews's ensuing search, Reynolds indicated, turned up nothing.

In the meantime, on or around December 15, 2000, Reynolds was served with papers in a small claims court suit that Bennett had filed against him.[8] Although he had sued individually and not in the name of Bonham Corporation, Bennett later claimed that he had intended to sue in his capacity as corporate president. Bennett pled that Reynolds had breached an agreement to pay half the cost of the disputed fence and sought recovery of $4,500—an average of $3 per foot of fence. Bennett also sought exemplary damages. The case was tried on January 14, 2001. The court ruled in favor of Reynolds.

Following the trial, Reynolds mentioned to Bennett that he was missing some cattle and asked if Bennett had seen them. Bennett acknowledged that Reynolds did not accuse him at this time of *stealing* cattle. Bennett responded by accusing Reynolds of stealing Bennett's cattle. Bennett later claimed at trial that Larry Grant—who had lived and worked on the Bennett Ranch for several years before quitting in early January 2001—told him that he'd seen Reynolds taking black cattle out of the ranch. Bennett and Reynolds each proceeded to the San Saba County Sheriff's Office. Bennett reported that he had lost black cows, later testifying that "[m]ost of my cows were

---

[7] Reynolds testified that he wasn't able to speak with Andrews until sometime during the Christmas holidays. The two agreed that "we can't do anything now" and to wait until after New Year's.

[8] The record is unclear whether Reynolds began attempting to reach Andrews before or after he was served with the suit.

black." Caught in the middle, Sheriff John Wells accompanied Bennett in driving around the Locker property to look for Bennett's cattle, while his deputy, Doug Clancy, similarly accompanied Reynolds in driving around the Bennett Ranch to see if Reynolds's missing cattle were there. Neither effort uncovered any stolen or missing cattle.

Although harboring some suspicions about Bennett, Reynolds testified that, lacking any firm evidence, he did not file any report with law enforcement accusing Bennett of stealing his cattle until after a fortuitous discovery in October 2001.

**Grant's photographs**

On October 2, 2001, Reynolds was driving with a longtime friend, Mack Maxcey, Jr., to a Mills County location where Maxcey had done some construction work. Maxcey had not been paid for the work, and was in litigation. Reynolds had agreed to provide a third-party estimate of the cost of the work. While passing by the Bennett Ranch, Reynolds made a comment to the effect that "I think I've lost some cattle in there," terming the ranch "the black hole." Maxcey responded that he might know something about it.

Maxcey's wife, Debbie, was the sister of Larry Grant. Grant had moved to Coleman in late December 2000 or early January 2001 and quit working at the ranch shortly thereafter. Reynolds's conversation with Mack Maxcey prompted him to contact Debbie Maxcey and ultimately to initiate one or two phone conversations with Grant on or before October 4. When the two spoke, Grant informed Reynolds about an incident where Bennett had directed Grant to haul to auction and sell some cattle that Grant had believed did not belong to Bennett. While en route to the auction barn, moreover, Grant had stopped at the Dollar General Store in San Saba, purchased a disposable

9

camera, and taken several pictures of the cattle in the trailer because, Grant later testified, he had wanted to cover himself. Grant had then proceeded to the Jordan Cattle Auction, an auction barn in San Saba, and, as instructed, sold the cattle in Bennett's name.[9]

According to Reynolds, he advised Grant that he did not want to obtain or see the photos himself, but would be referring the matter to law enforcement for further investigation. Reynolds recounted that he called the Texas Rangers and Sheriff Wells, who "took it from there." Grant testified that he cooperated with the subsequent investigation and gave the photographs to the TSCRA's Jack Andrews during a meeting approximately a month after his conversations with Reynolds. The investigation continued and, in early 2002, Bennett was indicted for cattle theft. He was tried in 2003. On the evidence presented at the time—including a key exhibit that Reynolds later accused Bennett of "dummying up"—Bennett was acquitted.

**Proceedings below**

In February 2002, shortly after Bennett's indictment, Reynolds brought the present suit against Bennett and Bonham Corporation. As he amended his pleadings before trial, Reynolds alleged that Bennett and the Bonham Corporation converted at least 13 head of his cattle by selling them at Jordan Cattle Auction on or about October 11, 2000, and keeping the proceeds of $5,327.11. Reynolds also sought punitive damages in excess of statutory caps from both defendants, alleging

---

[9] Grant testified that he did not previously know who owned the cattle depicted in the photos or their brands, only "[t]hat Tom stole some cows." He did not reveal the photographs' existence to Bennett or to law enforcement—although he did confide in his sister, Debbie Maxcey. Ms. Maxcey recounted that she thought Grant showed her the prints sometime in December 2000, before he left the Bennett Ranch. Grant testified that he took the prints and negatives with him to Coleman (where he kept them in a box that included "a thousand pictures") and eventually forgot about them.

that each had acted with malice and that their conduct is classified as a third-degree felony or higher in chapter 31 of the penal code.[10] Reynolds additionally alleged a theory of "reverse" alter-ego liability against Bonham Corporation, pleading that "[t]he James B. Bonham Corporation is an 'alter ego' or mere extension of Defendant, Thomas O. Bennett, Jr.," such that "the acts of Bennett are the acts of the Corporation and Bennett should not be allowed to protect his assets by holding them in the Corporation's name."[11] Bennett counter-claimed against Reynolds, alleging that he conspired with Larry Grant "to wrongly and falsely accuse [Bennett] of stealing [Reynolds's] livestock," and seeking actual and punitive damages. The case was tried to a jury in a bifurcated proceeding.

During the liability phase of trial, the evidence was undisputed that on October 11, 2001, Grant, at Bennett's direction, had transported to Jordan Cattle Auction and sold, in Bennett's name, 13 cattle found on the Bennett Ranch—7 cows and 6 calves—garnering total net proceeds of $5,327.11. Beyond this, the parties presented hotly-disputed evidence concerning (1) whether Reynolds or Bennett had owned the cattle; (2) Bennett's state of mind regarding the cattle's ownership; and (3) the culpability of Bonham Corporation for any wrongful acts by Bennett. This evidence, which we describe below, included not only Grant's photographs, auction barn records, and other comparisons of Reynolds's missing cattle with the 13 cattle sold, but also allegations of attempted blackmail, bribery, witness-tampering, and evidence fabrication.

---

[10] *See* Act of April 6, 1995, 74th Leg., R.S., ch. 19, § 1, sec. 41.008, 1995 Tex. Gen. Laws 108, 111 (amended 2003) (current version at Tex. Civ. Prac. & Rem. Code Ann. § 41.008(c)(13) (West Supp. 2007) (exempting from statutory caps on punitive damages conduct described in chapter 31 of penal code as third-degree felony theft).

[11] *See Zahra Spiritual Trust v. United States*, 910 F.2d 240, 243-46 (5th Cir. 1990); *cf. Castleberry v. Branscom*, 721 S.W.2d 270, 271-72 (Tex. 1986) (describing conventional alter-ego theory of piercing corporate veil to impose liability on individual for corporation's acts).

The district court submitted issues inquiring as to whether Bennett, Bonham Corporation, or both, "either individually or through an agent, convert[ed] . . . cattle owned by Randy Reynolds"; "the reasonable cash market value, if any, of the cattle converted by any of the Defendants"; whether each defendant had acted with malice; and whether each defendant had committed theft of 10 or more head of cattle during a single transaction and the aggregate value of those cattle was less than $100,000.[12] In addition to submitting these liability issues against Bonham Corporation with instructions regarding agency principles, the district court also submitted, over Bonham Corporation's objection, Reynolds's reverse alter-ego theory. The jury found in the affirmative on each of the liability issues submitted against each defendant and found that the reasonable cash value of the converted cattle was $5,327.11, an amount corresponding to the net proceeds from the sale of the 13 cattle.

The district court also submitted issues inquiring as to liability, causation and damages under Bennett's counter-claim that Reynolds conspired with Grant to falsely accuse him of cattle theft. These issues were predicated upon an adverse jury finding on the issue of whether Bennett had converted cattle. Having found that Bennett had converted Reynolds's cattle, the jury did not reach the conspiracy issues.

Following the punitive-damages trial phase, the jury awarded $250,000 against Bennett and $1 million against Bonham Corporation. The district court rendered judgment on the

---

[12] Theft of "10 or more head of cattle . . . stolen during a single transaction and having an aggregate value of less than $100,000" is a third degree felony under chapter 31 of the penal code. *See* Act of May 29, 1995, 74th Leg., R.S., ch. 318, § 9, 1995 Tex. Gen. Laws 2734, 2738 (current version at Tex. Penal Code Ann. § 31.03(e)(5)(A) (West Supp. 2007)). Thus, this issue controlled whether chapter 41's statutory caps on punitive damages would apply.

12

verdict, awarding Reynolds $5,327.11 in actual damages against Bennett and Bonham Corporation, imposed jointly and severally, $250,000 in punitive damages against Bennett, and $1 million in punitive damages against Bonham Corporation. Bennett and Bonham Corporation each appeal.

## ANALYSIS

Bennett brings seven issues on appeal. In his first six issues, Bennett challenges the legal and factual sufficiency of the evidence, respectively, supporting the jury's findings that the reasonable cash market value of the converted cattle was $5,327.11 (issues 1 & 2); that the harm to Reynolds resulted from malice by Bennett (issues 3 & 4); and that Bennett committed theft of 10 or more cattle having an aggregate value less than $100,000 (issues 5 & 6). Bennett thus does not challenge the jury's finding that he "either individually or through an agent, convert[ed] . . . cattle owned by Randy Reynolds."

Bonham Corporation brings 12 issues. In its first issue, it complains of charge error in the district court's submission of a reverse alter-ego theory of liability against it. Bonham Corporation's second through eleventh issues challenge the legal and factual sufficiency of the evidence supporting the jury's findings that Bonham Corporation was an alter ego of Bennett (issues 2 & 3); that Bonham Corporation, through an agent, converted cattle owned by Reynolds (issues 4 & 5); that the reasonable cash market value of the converted cattle was $5,327.11 (issues 6 & 7); that Bennett's malice could be attributed to Bonham Corporation (issues 8 & 9); and that Bonham Corporation committed theft of 10 or more cattle having an aggregate value less than $100,000 (issues 10 & 11).

13

In the final issue brought by each appellant, Bennett and Bonham Corporation assert that the punitive damages awards imposed by the jury violate due process of law.

**Sufficiency-of-the-evidence issues**

### *Standard of review*

We will sustain a legal-sufficiency complaint if the record reveals: (a) the complete absence of a vital fact; (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (c) the evidence offered to prove a vital fact is no more than a mere scintilla; or (d) the evidence establishes conclusively the opposite of the vital fact. *City of Keller v. Wilson*, 168 S.W.3d 802, 810 (Tex. 2005). The ultimate test for legal sufficiency is whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review. *See id.* at 827.

When the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence, the evidence is less than a scintilla and, in legal effect, is no evidence. *See Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex. 2004). But more than a scintilla of evidence exists if the evidence rises to a level that would enable reasonable and fair-minded people to differ in their conclusions. *Id*. We review the evidence in the light favorable to the verdict, crediting favorable evidence if reasonable jurors could and disregarding contrary evidence unless reasonable jurors could not. *See City of Keller*, 168 S.W.3d at 807.

When reviewing a challenge to the factual sufficiency of the evidence supporting a vital fact, we must consider, weigh, and examine all of the evidence in the record, both supporting and against the finding, to decide whether the verdict should be set aside. *Plas-Tex, Inc.*

14

*v. U.S. Steel Corp.*, 772 S.W.2d 442, 445 (Tex. 1989); *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986). We should set aside the verdict only if the evidence that supports the jury finding is so weak as to be clearly wrong and manifestly unjust. *See Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986). But we may not merely substitute our judgment for that of the jury. *Pool*, 715 S.W.2d at 635. The jury remains the sole judge of witnesses' credibility and the weight to be given their testimony. *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003).

With both legal and factual sufficiency challenges, the starting point of our analysis—barring a preserved and valid complaint of charge error—is the charge actually submitted to the jury. *Osterberg v. Peca*, 12 S.W.3d 31, 55 (Tex. 2000) (legal sufficiency); *Jackson*, 116 S.W.3d at 762 (factual sufficiency); *Ancira Enters., Inc. v. Fischer*, 178 S.W.3d 82, 93 (Tex. App.—Austin 2005, no pet.). Here, Bennett brings no complaint of charge error, and Bonham Corporation's sole issue concerns the reverse alter-ego submission. That complaint, as we explain below, we need not reach.

### Reynolds's ownership of the cattle

On the record before us, we can uphold the jury's finding of $5,327.11 in actual damages against the appellants' challenges only if there is legally and factually sufficient evidence that Reynolds owned all 13 of the cattle sold in Bennett's name at Jordan Cattle Auction—and not some lesser number.[13] If we conclude there is legally and factually sufficient evidence that Reynolds

---

[13] On appeal, Bennett concedes that "[t]he evidence shows that some of the cattle [sold on October 12, 2000] may have belonged to [Reynolds]." However, he urges that the evidence is insufficient to support the full $5,327.11 in actual damages the jury awarded as the reasonable cash value of the cattle converted. Bennett asserts that "by making this finding," the jury "by necessity

15

owned all 13 of these cattle, this would also foreclose Bennett's challenges to the "cap-buster" finding against him because he complains only that the evidence cannot support a finding that he committed "theft of *10* or more head of cattle during a single transaction . . . ." We conclude that the evidence is legally and factually sufficient for the jury to find that Reynolds owned all 13 of the cattle.

Bennett's principal argument to the contrary is that "[a]t most, [Reynolds] identified four head of cattle that belonged to him from the pictures taken by Larry Grant." We observe that while the photographs were a component of Reynolds's proof of his ownership at trial, Reynolds relied on a much broader range of circumstantial evidence. The inferences the jury could reasonably draw from this evidence depend in part on numerous contextual facts regarding cattle ranching and the manner in which the cattle were sold.

As already noted, it was undisputed that weather conditions at relevant times were conducive to cattle escaping pastures along the Colorado by entering the exposed riverbed. The jury heard evidence that in mid-October 2000—approximately the same time that Bennett had the 13 cattle sold in his name at Jordan Cattle Auction—Reynolds had discovered 23 of his head missing from the pasture he leased from Mrs. Locker. Reynolds recounted that these cattle consisted of

---

found that 13 head of cattle were converted." Reynolds does not question that, in light of the evidence of actual damages, the jury's award must be based on legally and factually sufficient evidence that all 13 cattle had belonged to him. *See First State Bank v. Keilman*, 851 S.W.2d 914, 930 (Tex. App.—Austin 1993, writ denied) (evidence enabled jury only to choose between alternative damages figures and did not support award within range between those figures).

Although Bonham Corporation, unlike Bennett, challenges the jury's finding that it converted cattle, it advances the same arguments as Bennett in challenging the jury's award of $5,327.11 in actual damages from the conversion.

11 black Brangus cows, each paired with a calf, plus a black Limousin bull. At the time, Reynolds testified, he had been running a total of 29 mother cows on the property, all Brangus, and all black except for one red Brangus, along with the black Limousin bull. Among the calves that year were "a couple of smoky calves"—i.e., gray calves—that Reynolds attributed to breeding between the black cows and a Charolais bull that Reynolds had placed on the property the previous year. Reynolds observed that his cows generally calved in January or February, and that by October, the calves were running "[f]ive or six hundred pounds."

Reynolds added that the missing cows—though not the calves or the bull—each bore a "Rafter L" brand on the right hip.[14] Generally speaking, the Rafter L resembled a capital "L" or inverted J, with a rafter shape, similar to an inverted "V," atop the L. The Rafter L had been the registered brand of the late Lloyd Locker. After Mr. Locker died and Reynolds purchased many of his cattle, Reynolds registered the Rafter L in his own name.[15]

Reynolds also noted that some of the missing cows, although he was unsure how many, also bore an "MK" brand on the left hip. That brand, several witnesses confirmed, was a registered brand of Frank and Melanie King, the owners of Bay Maintenance, Inc. Reynolds testified—and records from the Jordan Cattle Auction, where he had bought the cattle, confirmed—that he had purchased 11 cow-calf pair—six black, five red—from Bay Maintenance in June 1998. Reynolds stated that he had placed the 11 pair on the Locker property and branded them with the

---

[14] Reynolds explained that after calves were born, he would generally brand his heifers when they were yearlings if he had decided to keep them, but would sometimes wait longer before deciding "[t]o see what kind of calf they have."

[15] Reynolds explained that his wife was a Locker, the brand was already known in San Saba County, and the cattle he had purchased already bore the brand.

17

Rafter L.[16]  He also observed that by October 2000, he "probably" no longer had any of the original cattle that Mr. Locker had owned or branded.

As previously noted, Reynolds testified that he had tracked his escaped cattle along the dried Colorado riverbed to an open gate leading into the Bennett Ranch.  In November 2000, moreover, he recovered from the Bennett Ranch six of the missing cattle—four cows, a calf, and the Limousin bull—leaving 7 of his cows and 10 calves unaccounted for.  To further link his 17 unrecovered cattle to the 7 cows and 6 calves that were sold,[17] Reynolds compared the physical features of his missing cattle to various witnesses' descriptions of the 13 cattle as they were being rounded up and sold.

Larry Grant testified that when assisting Bennett in rounding up and loading the cattle for transport to auction, "I had my doubts" that the cattle belonged to Bennett, based on his experience in working on the Bennett Ranch for several years and also living there for extended periods.  Grant and other witnesses also testified concerning the cattle's identifying characteristics as they were viewed or recorded at Jordan Cattle Auction during the sale process.  Among the witnesses describing the auction barn's operations and business records were Kynda Jordan, the Jordan Cattle Auction bookkeeper and records custodian, and John Wells, Sheriff of San Saba County.  Sheriff Wells, it so happens, had worked for the auction barn for several years before becoming sheriff.

---

[16]  As several witnesses noted, it is not unusual for cattle to bear more than one brand, as succeeding purchasers may add their own brands to those remaining from prior owners.

[17]  In other words, under Reynolds's theory, four of his missing calves were neither recovered by him nor sold by Bennett.

18

As the process was described at trial, when cattle are unloaded at Jordan Cattle Auction, they are moved through a chute, auction barn personnel slap an adhesive paper tag on each head's hip that is coded to identify the seller (the "back tag" or "sale tag"), and a check-in form is completed that indicated the identity of the seller, the time of delivery, the sale tag number of each head, and a description of each head. A copy of such a check-in form was given to Grant, which reflected that the seller was Tom Bennett, at the Bennett Ranch address; delivery on October 11, 2000, at 10:51 a.m., of 7 black cows, 3 black heifer calves, 2 black steer calves, and one gray steer calf; and sale tags numbered 992-1005.

Grant testified that he witnessed the unloaded cattle going through the chute moving, from his perspective, left-to-right, with their heads to the right and rears to the left, such that he was viewing the right sides of the cattle.[18] He recounted that he saw a common brand on the right sides of the cows that looked "[l]ike a backwards 'J.'" Grant claims that he had not noticed the brands until that time, and admitted that, at the time, he had not known what Reynolds's brand was. Nonetheless, upon seeing the brands, Grant testified, "I knew they wasn't Tom's cows," explaining that "all the brands were on that side and Tom don't brand his cows."

Jordan Cattle Auction was required to test the blood of each adult female head of cattle who had given birth for brucellosis. A veterinarian would oversee the "bleeding" of each cow and log her identifying information, chiefly an identification number found on a permanent metal

_____

[18] While consistently stating that he was viewing the cattle as they moved head-first through the chute going left-to-right, Grant initially used "left" rather than "right" to identify the side of the cattle he was viewing. He later corrected himself, explained that he had initially used "left" from the perspective of one facing the cattle head-on.

19

tag in her ear (the "ear tag" or "blood tag"). Sheriff Wells explained that some cows brought to auction would already have an ear tag that had been applied either when she was vaccinated as a calf or when previously tested at sale or upon birth of a calf. Other cows who did not have tags, Wells explained, would each be given one at the auction barn.[19]

A log dated October 12, 2001, reflected brucellosis testing of seven adult female black cows being sold by Bennett having ear tag numbers SYP8071, SNH2957, and five with the prefix ELB and numbers 3921, 3924, 3926, 3934 and 3935. The entries for these cattle on the log were interspersed with those for cattle being sold by others (consistent with the cattle, already with sale tags attached, having been mixed in a pen with other cattle by that time). Observing that all of the ELB-prefixed tag numbers appeared on the log in perfect sequential order,[20] Sheriff Wells deduced that, based on his experience, the ELB-prefixed ear tags had been applied at Jordan Cattle Auction to cows not already having ear tags when tested, while the other prefixes represented ear

---

[19] Wells elaborated that "[t]here's a vaccine to prevent brucellosis that's given to a heifer before she's had a calf. After she's had a calf, they do a brucellosis test. There's lots of cows with tags in their ears that just had a brucellosis test and they were not calfhood vaccinated." He added that "[i]f they've been through a sale before, they're usually going to have one. It's like on my cattle, I don't calfhood vaccinate them. And when I sell them, they put a tag in their ear."

During cross-examination, Wells acknowledged that cows who were vaccinated for brucellosis as calves would also receive ear tattoos—a potential identifying mark. During her cross-examination, Kynda Jordan seemed to suggest that the tattoo would be a number consistent with the ear tag. Wells observed, however, that "[m]ost of the tattoos are not readable," "I've never seen one tattooed when they're testing for brucellosis" as opposed to calfhood vaccination, and that he had never seen a tattoo given to a grown cow.

[20] Two pages of this log were in evidence. The ear tag entries contain a wide variety of ear tag prefixes and numbers, but 24—roughly half—had a prefix of "ELB." Each of these 24 entries have numbers running, in perfect sequential order on the log, and regardless of the cow's owner, from ELB3915 through ELB3938.

tags that were already on the cows when tested. Consequently, in Wells's analysis, only two of the seven cows being sold by Bennett were already bearing ear tags at the time they were tested.

Wells testified that he traced back the two preexisting ear tag numbers—SYP8071 and SNH2957—and, while not finding a perfect match, identified each as being virtually identical to an ear tag on one of the cows that Randy Reynolds had purchased through Jordan Cattle Auction from Bay Maintenance in 1998. Wells observed that the brucellosis testing logs of the Bay Maintenance cows when sold in 1998 reflected one having an ear tag numbered SYP8701—differing from Bennett's SYP8071 only in the transposition of the 0 and 7—and another with SNH2967—differing from Bennett's SNH2957 only in the substitution of a 6 for the 5. Wells opined that these were likely the same ear tag numbers, attributing the deviations to logging errors amid what he described as a chaotic environment in which the tag numbers would have been identified and recorded.[21]

The cattle were also examined prior to sale by a TSCRA brand inspector, David Munden. Munden testified that his job was to "gather the brands on cattle on each week at

---

[21] Sheriff Wells explained:

> [T]he cows are run down a chute, a hydraulic chute, and there's a lot of cows bawling, kicking, the hydraulic, and they catch the cow's head in the head gate, and an individual reads the number off to another individual standing by what they call the vet shack. They've got a little table where they're writing this down.

Wells added that during a "regular sale," "probably 1200" cattle—comprised of "a few cows and a lot of calves"—would go through the sale barn, while during a "special sale" a much greater proportion of cows relative to calves would be sold. Because cows, not calves, were required to be tested for brucellosis, a special sale required much more testing and logging than a regular sale—creating an even more chaotic atmosphere. Wells observed that Reynolds purchased the Bay Maintenance cattle at a special sale, suggesting an even greater than normal prospect of human error when those cattle's ear tags were logged.

21

a sale and then I fill out a form to send those brands into the main [TSCRA] office in Fort Worth." Munden completed such a form—known as an "F1"—regarding the 13 head being sold by Bennett. He did not specifically describe each head, but indicated only that the cattle had sale tag numbers "992-1005," and checked boxes on the form indicating that the cattle were black in color, cows, and muleys (without horns). Munden also indicated that the cattle had a "holding brand"—a brand common to each of the cattle, but not necessarily the sole brand that each had—a Rafter L, albeit on the *left* hip.[22]

Once the cattle were sold, a Jordan Cattle Auction sales sheet, dated October 12, 2000, was generated with an itemized description of each of the 13 head and the amount for which each sold. The documents also reflected that the total of these sale prices, net of commission and fees, equaled $5,327.11. It also described the cattle by sale tag number,[23] color, description, buyer, weight, and price for which each sold. The document reflected the sale by Bennett of 7 black cows, 3 black heifer calves, 2 black steer calves, and 1 gray steer calf, and that each head was sold separately among several different buyers. It also reflected that the black calves weighed 480, 495, 510, 560, and 595 pounds, although the gray steer calf weighed 805 pounds. A check for $5,327.11

---

[22] Munden acknowledged that he did not indicate on the F1 that the 13 head had included any calves and that he should have indicated separately the back tag numbers and descriptions of any calves or un-branded cattle. He further admitted that he would rely primarily on the auction barn's check-in form to identify the cattle being sold by each owner, that he would track down and examine the brands on those cattle while they were in a pen mixed with numerous other cattle, and that "I might have made a mistake" while identifying the brands or descriptions of the cattle. Munden suggested that he "probably" had failed to properly write down the descriptive information from the check-in form for all 13 of the cattle.

[23] These corresponded to the sale and back tag numbers recorded on the check-in form and the brucellosis testing logs.

was also generated, payable to Tom Bennett. It is undisputed that Bennett cashed the check and spent the funds.

Viewing the foregoing evidence in the light most favorable to the verdict, and crediting the favorable evidence that the jury reasonably could have and disregarding contrary evidence unless the jury reasonably could not have, the jury could have reasonably inferred that (1) 23 head of Reynolds's cattle had escaped the Locker property and entered the Bennett Ranch at the same time that Bennett had the 13 cattle rounded up and sold; (2) Reynolds's descriptions of his missing cattle corresponded to the descriptions of the 13 cattle reflected in Jordan Cattle Auction records, including matching colors, weight, and gender; (3) both Munden and Grant had identified or described a Rafter L brand they had seen on the 7 cows; (4) Sheriff Wells had traced two of the cows to those Reynolds purchased from Bay Maintenance in 1998; and (5) at the time Reynolds's cattle went missing, the calves were each still paired with a cow.[24] Bennett barely acknowledges this evidence,[25] focusing instead on the content of Grant's photographs.

Ten of Grant's photographs were in evidence.[26] Bennett acknowledged that the images depicted the same cattle that had come off the Bennett Ranch on October 11, 2000, and were

---

[24] Also, when Reynolds recovered four cows and one calf from the Bennett Ranch in November 2000, a month later, he recalled that one of the calves was still nursing.

[25] Bennett does argue that David Munden "had no independent recollection of the cattle," "testified merely from a written record," and inspected the cattle while they were mixed in a pen with numerous other cattle (although they were bearing sale tags). These matters go to the weight to be given Munden's testimony and are for the jury alone.

[26] The jury considered two versions of the same images: Grant's original prints, which were identified as PX-5 through -14—which had also been exhibits in Bennett's criminal trial—and enlargements of the same pictures from Grant's negatives, labeled as PX-5A through -14A. The original prints were roughly 3"x5" prints, while the enlargements appeared to be 4"x 6". Reynolds's counsel also was permitted to utilize computer-scanned images of the negatives and an overhead projector to display enlarged images of the photographs to aid the jury. We will identify the photographs being referenced in testimony simply as PX-5 through PX-14, except where their format becomes relevant.

23

the same ones sold on the following day. The parties hotly disputed what the photographs showed, however. We observe that neither Reynolds nor Grant elaborated on whether the photographs—some of which show only close-ups of brands or other cattle features—depict each of the 13 cattle in the trailer or the extent to which some of the cattle were depicted in more than one photograph.

Reynolds testified that three of the photographs—PX-5, -6, and -8—depicted at least one black cow with a Rafter L brand. David Munden, the TSCRA brand inspector, concurred that these brands were Rafter L's. Reynolds and Munden also agreed that another photograph, PX-7, depicted a close-up of an "MK" brand on a cow's left hip—the brand of Bay Maintenance owners Frank and Melanie King, registered in McCulloch County. Harold Gage, the ranch manager for the Kings, also testified that the brand "looks to me like it's the MK," the Bay Maintenance brand, and that the brand appeared in the location on the cow where Bay Maintenance normally placed it. Gage was unaware of anyone else who had registered the MK brand in another county. Reynolds further observed that the cow looked like one of those he had purchased from Bay Maintenance in 1998 and placed on the Locker property.

In another photograph, PX-9, Reynolds identified a calf in the right foreground as a "smoky calf" that looked like one of those he had on the Locker property, the product of cross-breeding between one of his black Brangus cows and Charolais bull. Finally, according to Reynolds, PX-13 was a close-up of a brand on a cow's left hip that, according to Reynolds, "looks like a Box W." Reynolds testified that he owned some cattle bearing the Box W brand that he had previously purchased.

At trial, Bennett disputed whether any of Grant's photographs showed a Rafter L brand. He described one of the brands shown in PX-6, identified by other witnesses as a Rafter L, as "a quarter cycle L," suggesting that it had a "round top" distinguishable from what he

24

characterized as the pointed top of the Rafter L brand. Bennett was similarly adamant that the "MK" other witnesses identified in PX-7 was actually an "ML" brand on a cow that he had purchased in Brownwood or Abilene[27]; that the "smoky" calf in PX-9 was actually a "red, red cow" that "came out of [his] red Santa Gertrudis cow"; and that the cow in PX-13 "came from the Brownwood cattle."

Bennett also asserted that one of the brands shown in PX-6, identified by other witnesses as a Rafter L, was actually a D with a slash through its upper left corner—"a bar D, like if a man had a brand name Tom Dooley or something." In support, Bennett relied on what purported to be two enlargements of PX-6 that had also been key to his defense in his criminal trial. PX-35 was roughly 8 ½" x 11", while PX-36 was a large poster-sized print. In each enlargement, Bennett pointed to what appeared to be a white rounded line in the brand connecting the bottom right end of what the other witnesses had identified as the "L" to the right lower end of the "rafter,"creating the "D." During his adverse direct examination of Bennett, Reynolds's counsel

---

[27] Bennett initially contended that the cow bore the registered brand of a Mark Lundgren of Jones County, from whom Bennett claimed he had purchased 22 black cattle in 1995. He introduced what purported to be a handwritten receipt from the individual who delivered the cattle to Bennett. Bennett claimed that he had purchased these and other cattle in response to newspaper advertisements. (Thus, the transaction would have lacked the more extensive "paper trail" of Reynolds's transactions through Jordan Cattle Auction).

When confronted with Jones County brand records indicating that Mr. Lundgren branded on the *right* hip and his admission that the brand in the photo was on the *left* hip, Bennett at first dismissed the discrepancy, explaining that, "Just because it that's on the wrong hip, that doesn't mean anything. A lot of times people get them on the wrong hip." Bennett subsequently pointed out that other ranchers had registered brands in Jones County that were some version of an "ML" on the left hip. Bennett suggested that he had bought cattle in Brownwood that "could have come from there."

questioned whether Bennett had "dummied up" his enlargements of PX-6 while showing the jury enlarged images of PX-6 on an overhead projector, challenging Bennett to find the rounded white line and "D" shown in his enlargements. Bennett steadfastly insisted that the "D" was clearly discernable in the images.[28]

---

[28] The following exchange is illustrative of what the jury heard and saw regarding Bennett's "Tom Dooley" brand:

Q:     . . . And what you're saying is, if you blow this thing [PX-6] up, it will look like a D?  Is that what you're saying?

A:     Yes, sir. . . . It looks like a D.  It says a D.

Q:     There—lower that a little bit.  Enlarge it a little more.  Bring it down to the middle.  Enlarge it a little more.  Can you enlarge it again?

       Does that start looking like a D to you?

A:     Yes, sir.  You can see the white coming out over there with the hairs grown over it.  On the right, you can see it coming out, right there on the right.

Q:     You talking about right there?

A:     Right there, yes, sir.

Q:     Okay.  You think that's making a D?

A:     Yes, sir.  It comes right up.

Q:     Well, let's enlarge it a little bit more.  Can you move it over there where that white was?

A:     You can see that coming right on up, yes, sir.

Q:     And you're claiming that that makes that D?

A:     You can see where the—it's coming up, yes, sir.  That's the hair growing over it.

26

Bennett acknowledged that he had made PX-35 "[p]robably at Wal-Mart" on a "picture machine" resembling a "copy machine." He had the poster-sized PX-36 blown up "[a]t a place in Dallas . . . that has a big picture machine," but could not name the person who made it. Bennett also admitted that he had not presented any expert testimony to authenticate the enlargements—even though he had designated an expert to prove up some of his tape recordings—because "I didn't feel like I needed one . . . because anybody can look at that picture and see it."

In addition to viewing the brands depicted in the photographs, the jury considered evidence that Reynolds's Rafter L brands were not entirely uniform because of differences in the

---

Q:    How much larger are we going to have to make it before you can see that D like you can in the exhibit you offer?

A:    I already said I can see the D, sir.

Q:    Well, it's pretty plain in your exhibit, isn't it?

A:    It's pretty plain in yours to me.

Q:    You think that's plain?

A:    Yes, sir. Positively not—not a Rafter L.

                              *   *   *

Q:    And it's your sworn testimony that the D brand on Plaintiff's Exhibit No. 36 is an untouched-up blow-up of Plaintiff's Exhibit No.—or State's Exhibit No. 2 [in the criminal trial] . . . [w]hich is Plaintiff's Exhibit No. 6 in this case?

A:    That's right.

27

branding irons he used, "smearing" of the brand due to blistering, and the difficulty of achieving a "perfect" brand on a cow struggling to escape the hot iron.

We conclude that the jury could reasonably have resolved conflicts in the evidence to conclude that the photographs depict several cows with Rafter L brands, a cow with the Bay Maintenance MK brand that resembled one of those Reynolds purchased in 1998, a box W brand that some of Reynolds's cattle bore, and Reynolds's "smoky" calf.[29] Further, as we elaborate below, the jury could have considered Bennett's own evidence of ownership—especially the "Tom Dooley" enlargements—as probative of his ongoing efforts, continuing through trial, to avoid his knowing responsibility for having sold Reynolds's cattle.

We conclude that the evidence was sufficient to enable a reasonable and fair-minded jury to infer that all 13 cattle had belonged to Reynolds. *See City of Keller*, 168 S.W.3d at 827. Furthermore, considering both the evidence supporting the finding and the contrary evidence on which the appellants rely on appeal, we conclude that the contrary evidence is not so overwhelming as to render the jury's finding clearly wrong and manifestly unjust. *See Cain*, 709 S.W.2d at 176. Such inconsistencies go merely to the testimony's weight or credibility, and were within the sole province of the jury to resolve. *Jackson*, 116 S.W.3d at 761. We accordingly overrule Bennett's first, second, fifth and sixth issues, and Bonham Corporation's sixth and seventh issues.

---

[29] On appeal, Bennett also asserts that Reynolds "did not claim to own the cow depicted in PX-7," suggesting some sort of conclusive admission by Reynolds that he did not own at least one of the 13 cattle in the trailer. We have reviewed the testimony on which Bennett relies and conclude that, at most, Reynolds acknowledged some inconsistencies between his trial and deposition testimony regarding his perceptions of PX-7 that were not conclusive, go only to Reynolds's credibility, and which the jury could have disregarded.

*Malice by Bennett*

The district court's submission of Bennett's liability for punitive damages inquired whether the jury found "by clear and convincing evidence that the harm to Plaintiff resulted from malice by Defendant Bennett." "Malice" was defined as:

(a)   a specific intent by Defendant Bennett to cause substantial injury to Plaintiff; or

(b)   an act or omission by Defendant Bennett;

   (1)   which, when viewed objectively from the standpoint of Defendant Bennett at the time of its occurrence, involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others; and

   (2)   of which Defendant Bennett had actual, subjective awareness of the risk involved, but nevertheless proceeded with conscious indifference to the rights, safety or welfare of others.

"Specific intent," as referenced in subpart (a) of the malice definition, means that "the actor desires to cause the consequences of his act, or that he believes the consequences are substantially certain to result from it." *Reed Tool Co. v. Copelin*, 689 S.W.2d 404, 406 (Tex. 1985). Subpart (b) corresponds to the definition of gross negligence. *See Mobil Oil Co. v. Ellender*, 968 S.W.2d 917, 921 (Tex. 1998). As reflected in the charge, it has two elements. Under the first or "objective" element, "extreme risk" is not a remote possibility of injury or even a high probability of minor harm, but rather the likelihood of serious injury to the plaintiff. *Id*. at 921. Under the second or "subjective" element, "actual awareness" means that the defendant knew about the risk, but the

defendant's acts or omissions demonstrated that it did not care. *See Wal-Mart Stores, Inc. v. Alexander*, 868 S.W.2d 322, 326 (Tex. 1993).

Malice may be proven by circumstantial evidence. *Transportation Ins. Co. v. Moriel*, 879 S.W.2d 10, 23 (Tex. 1994). Malice may be implied from the conversion of another's property when the defendant knew or should have known he had no legal right to the property. *Kinder Morgan N. Tex. Pipeline, L.P. v. Justiss*, 202 S.W.3d 427, 447-48 (Tex. App.—Texarkana 2006, no pet.).

The charge also defined "clear and convincing evidence" as "the measure or degree of proof that produces a firm belief or conviction of the truth of the allegations sought to be established." In light of this heightened standard of proof, we analyze Bennett's sufficiency challenges to the jury's malice finding under a modified version of our legal and factual sufficiency standards of review. Specifically, "in reviewing the legal sufficiency of evidence to support a finding that must be proved by clear and convincing evidence, an appellate court must 'look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true.'" *Southwestern Bell Tel. Co. v. Garza*, 164 S.W.3d 607, 609 (Tex. 2004) (quoting *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002)).

> [A] reviewing court must assume that the fact finder resolved disputed facts in favor of its finding if a reasonable fact finder could do so. A corollary to this requirement is that a court should disregard all evidence that a reasonable fact finder could have disbelieved or found to have been incredible. This does not mean that a court must disregard all evidence that does not support the finding. Disregarding undisputed facts that do not support the finding could skew the analysis of whether there is clear and convincing evidence.

30

*Id*. at 627.

In a factual sufficiency review of a finding subject to a clear-and-convincing standard of proof, "a court of appeals must give due consideration to evidence that the fact finder could reasonably have found to be clear and convincing." *In re J.F.C.*, 96 S.W.3d at 266. "[T]he inquiry must be whether the evidence is such that a fact finder could reasonably form a firm belief or conviction about the truth" of the disputed finding. *Id.*

> A court of appeals should consider whether disputed evidence is such that a reasonable fact finder could not have resolved that disputed evidence in favor of its finding. If, in light of the entire record, the disputed evidence that a reasonable fact finder could not have credited in favor of the finding is so significant that a fact finder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient. A court of appeals should detail in its opinion why it has concluded that a reasonable fact finder could not have credited disputed evidence in favor of the finding.

*Id*. at 266-267.

To establish malice on the part of Bennett, Reynolds presented essentially three categories of evidence: (1) the information known to Bennett as the cattle were being penned and loaded for transport to auction; (2) Bennett's motives to sell the cattle despite his awareness that he did not own them; and (3) Bennett's efforts after the sale to cover-up his acts. We note that the nature of Bennett's acts bears not only on the jury's malice findings, but ultimately on our due process analysis as well.

31

*Information known to Bennett*

Larry Grant and Bennett each testified regarding the circumstances in which the 13 cattle were rounded up and loaded for transport to auction. Grant recounted that when he reported for work at the Bennett Ranch's shop on October 11, 2000, Bennett instructed him and another hired hand, Jerry McBride—whom Bennett had brought from Corsicana—"to grab the gooseneck trailer and we was going to go looking for some more cows" to haul to auction. The men took the trailer to the front of the property, near Farm Road 500, and parked in front of the Bonham Corporation-owned trailer home where Grant was living at the time. They proceeded on foot, with the two hired hands walking in one direction, Bennett another. Bennett eventually located some cattle, which the men drove on foot through a field and into a loading pen or corral.

The evidence supporting the jury's actual damages finding, again, included proof that the 13 cattle sold were black cows and calves (with the exception of a single smoky calf), that all of the cows had been branded with the Rafter L on the right hip, and that some of the cows had additional brands that included the Bay Maintenance MK and a Box W. Grant recounted that the cattle the men found were black, but "[t]hat's about all I could tell you" regarding the details of their appearances. Grant stated that he did not notice any branding on the cattle at that time, perceiving the "backward J" brands only after he later unloaded the cattle at the auction barn. Nonetheless, Grant testified that—having acquired familiarity with Bennett's cattle from working on the Bennett Ranch for several years and also living there for extended periods—"I had my doubts" that the cattle belonged to Bennett. Grant also observed that normally Bennett had "all different colors" of cattle on his ranch, although he admitted that Bennett did have some black cattle.

32

Grant claimed that he expressed his doubts about the cattle's ownership to Bennett and McBride. Over objection, the district court allowed Grant to testify that McBride then angrily called Bennett a "cattle rustler," instructing the jury that it could consider the hearsay statement only as it bore upon the information Bennett possessed at the time.[30] Grant added that, "I told [Bennett] I really didn't think they belonged to him." Bennett responded, according to Grant, that "if they didn't belong to him he would make it right, just take them to the sale." Grant testified that all three men participated in loading the cattle into the trailer.

Bennett acknowledged that the three men had rounded up 13 cattle and that he had directed Grant to haul them to auction, but differed from Grant's account in several key details. According to Bennett, the men drove 15 cattle into the corral, but cut out a black bull and a dark "curly-horned cow" that he "didn't recognize" as belonging to him, leaving 13.[31] Grant did not recall cutting out any cattle or anything about a curly-horned cow or a bull.

Bennett maintained that because the men had found these two strays amid his cattle, he instructed Grant "to be sure there wasn't anything else in there that was not mine and to sell the rest."[32] Grant denied that Bennett made such a statement.

---

[30] McBride did not testify. Bennett claimed that he had attempted unsuccessfully to locate McBride, describing him as a "drifter" whose whereabouts were simply unknown.

[31] Bennett testified that the men simply released the two strays and that he made no effort to contact neighbors or others regarding the strays. Bennett explained that he was in a hurry to leave and because he had assumed the cows would find their way home by whatever means they had entered the ranch. Bennett stated that he never saw those cows again.

[32] He added that McBride had "never helped us with the cattle before" and had no knowledge about the kind of cattle Bennett owned.

Bennett denied that McBride had made the "cattle rustler" remark. Over objection—and with the limiting instruction that the jury could consider it only for the purpose of showing the information known to Bennett—the district court permitted Bennett to testify about a subsequent statement in which McBride, according to Bennett, told him that McBride "remembered that I told Larry to cut out anything that wasn't mine and to sell the rest."

Bennett was unsure whether he had directly participated in loading the cattle into the trailer—he claimed he "was in a hurry that day to go to Corsicana" and, with McBride, left as soon as he could—but did not deny that it was "possible" that he helped load the cattle. During cross-examination, Bennett was pressed as to why the men would go to the trouble of loading the cattle—the cows weighed roughly 1,000 pounds each—if he had harbored some doubts about their ownership and anticipated that Grant might have to extract some from the trailer. To this, Bennett responded that "I don't know" whether he had told Grant to examine the cattle before or after they had already been loaded into the trailer, but maintained that "[i]f they weren't mine, I sure would" want him to unload the cattle.

Bennett testified, consistent with Grant, that he owned different colors of cattle and that some of his cattle were black. He explained that he had not branded his cattle in "[s]everal years" and did not believe he had ever branded the cattle he ran in San Saba County, but that most of the cattle he would purchase from others would have brands already on them. Bennett testified that he had cut out the black bull and curly-horned cow because, "I didn't recognize those two as being mine, so I wanted to be sure and cut them," adding that he "believe[d] the bull wasn't mine" because "[h]e looked different" than some black bulls that he owned. When pressed whether he had

34

similarly been able to get a good look at the other 13 cattle and their brands, however, Bennett responded, "Sir, my eyes been operated on about five times. I don't have good eyes. I told Larry [Grant] to look them over and be sure they were all mine."

_____*Bennett's motives*

On appeal, Reynolds does not contend that there is evidence Bennett knew, *at the time the 13 cattle were penned and loaded*, that they belonged to Reynolds, as opposed to merely knowing that they did not belong to him.[33] The jury nonetheless could reasonably have relied on evidence of Bennett's dispute with Reynolds regarding the fence, along with other evidence, in finding that Bennett had broader motives to sell the cattle despite an awareness that they did not belong to him.

Bennett claimed that the Bonham Corporation spent thousands of dollars tearing down and rebuilding the barbed-wire fence dividing the Bennett Ranch and the Locker property. Bennett testified that the new fencing had between five and as many as nine strands, and cost the corporation an average of $3 per foot. Further, unlike the many other area property owners who relied on the Colorado River alone to confine cattle, the corporation had constructed a fence along the river, which ran along what witnesses termed the "high bank." Monty Carlisle, who worked for

_____

[33] The evidence was undisputed that when attempting to locate his missing cattle during the fall of 2000, Reynolds was never able to make contact with Bennett and had no contact until mid-December, when Reynolds was served with Bennett's small claims court suit. Nor does Reynolds suggest there is evidence that Bennett knew at the time that the Rafter L brand was registered to Reynolds.

his father's cattle operation on a lease across the Colorado from the Bennett Ranch, described this fence along the river as "a new fence, a tall fence," with two or more gates.[34]

Mr. Carlisle testified concerning an incident in 2000 in which some of his father's cattle came onto the Bennett Ranch. Like other witnesses, Carlisle recalled that during that year, "the river was real low. It was dry and [we were] having a lot of trouble with cattle. There wasn't any running water, so they'd cross at the shoal." During this dry period, he saw some of the Carlisle cattle cross the Colorado onto an area of the Bennett Ranch below the fenced high bank. Carlisle, along with Brad Barnett, rode after the cattle on horseback, crossed the river at a rock shoal, and "went into those cattle to get them back." As they "were getting around the cattle," the men saw some people working on "an irrigation pump pad they were building." According to Carlisle, "I rode down there [on] horseback and told them what we were doing, why we were over there." Bennett, Carlisle testified, introduced himself (the two hadn't previously met), and a conversation ensued. Carlisle recounted that Bennett informed him that he owned the property, that "[h]e was self-made, and he was worth quite a bit of money." Bennett, Carlisle added, also stated that he didn't trust people.

Then, Carlisle continued, Bennett "asked me how I was going to get my cattle back across." Carlisle "told him we had to go back upriver quite a ways to a rock shoal, and then we could cross the river back over onto our property" because "at the point where those cattle were, the bank's too steep to do so." Bennett, according to Carlisle, offered to open his gates to let him and

---

[34] These gates were periodically left open, and it was through one of them that Reynolds testified his cattle had been able to enter the Bennett Ranch.

Barnett drive the cattle through the Bennett Ranch to short-cut back to the shoal. Carlisle agreed. However, Carlisle testified:

> And when we drove our cattle into his place and went just a little ways up there, at that time, he come up in his pickup and scattered the cattle and told us that the game had changed, that he had—was going to hold us and the cattle until that man who owned the property across the river—which was where we're at—would agree to build a fence like he'd built on his side.

Carlisle responded to Bennett that his father owned the cattle, and a man from Louisiana owned the land, "so it wasn't my deal." Carlisle stated that he offered to provide Bennett the phone number for his father or the landowner, "but there was nothing that I could do and I wasn't staying. I said you might hold the cattle, but you won't hold me." Carlisle testified that he and Barnett left, and that he thereafter called the Mills County and San Saba County sheriffs' departments. According to Carlisle, they were instructed by the justice of the peace to meet him at the Bennett Ranch gate on Farm Road 500, where they were allowed to enter and recover the cattle.

Bennett admitted remembering one day when Monty Carlisle and some of his cowboys rode up on horseback while he was working on the irrigation pump and that "[h]e said he was looking for cattle." Bennett recounted that he hadn't met the men previously and didn't know whether they actually owned the cattle they claimed. Although professing not to remember all of the details of the encounter—Bennett noted that "[i]t's been several years . . . and there were cattle in and out of that place many, many times"—Bennett recalled seeing some cattle on the Bennett Ranch that did not belong to him, although he could not remember whether he had noticed the cattle before or after the men rode up. Bennett stated that he called the justice of the peace "to get it

37

straighten[ed] out and be sure whose they were and get them to the right person, get them off my place." Bennett was sure he told Carlisle and Barnett that he wanted the cattle to remain there until the justice of peace arrived. Bennett emphatically denied that he had locked the men in the Bennett Ranch and threatened to hold them, terming Carlisle's contrary testimony "a lie."

When asked whether it made him "real angry when somebody has cattle on your ranch," Bennett acknowledged, "Well, I wouldn't like it. But I mean, it doesn't make me real angry, no; but I'm not crazy about anybody else's cattle on my place." He professed not to be aware of the open range law governing San Saba County.

On the other hand, there was evidence that Bennett had cooperated with R. C. Edmondson, who owned property along the Colorado between the Bennett Ranch and the Locker property, when Edmondson's cattle had gotten loose and entered the Bennett Ranch. Mr. Edmondson testified that when one of his bulls and some cattle had gone onto the Bennett Ranch, "Mr. Tom" had called him, they "set up a time," "he and I went over, and he helped round them up." Mr. Edmondson added that Bennett was a good neighbor and "[w]e like him."

### Bennett's attempts to cover-up

In addition to the foregoing evidence of pre-sale events probative of Bennett's awareness and intent, Reynolds presented evidence of numerous post-sale acts by Bennett to avoid responsibility for selling any cattle belonging to Reynolds. Evidence of post-act attempts by tortfeasors to cover-up or avoid responsibility for their acts may imply a consciousness that their acts were intentional or willful, and not a mere mistake or accident. *See Transmission Exch. Inc. v. Long*, 821 S.W.2d 265, 273 (Tex. App.—Houston [1st Dist.] 1991, writ denied) (jury finding of willful

38

misrepresentation was supported by evidence including "when appellants realized that appellee was willing to pursue his remedies at law, they instituted a cover-up in an attempt to avoid the consequences of their actions"); *Bennett v. Mason*, 572 S.W.2d 756, 760-61 (Tex. Civ. App.—Waco 1978, writ ref'd n.r.e.) (post-sale attempts by realtor—Bennett—to "cover up the truth" helped support finding that he had willfully made a misrepresentation to induce the purchase); *cf. King v. State*, 29 S.W.3d 556, 565 (Tex. Crim. App. 2000) (appellant's false statements to the media indicated "consciousness of guilt and an attempt to cover up the crime"); *Ross v. State*, 154 S.W.3d 804, 812 (Tex. App.—Houston [14th Dist.] 2004, pet. ref'd) ("A defendant's conduct after the commission of a crime which indicates a 'consciousness of guilt' is admissible to prove that he committed the offense."). The rule is particularly applicable in this case. Bennett, in addition to insisting that all 13 cattle had belonged to him, urged the alternative defense that he, at most, made an "honest mistake," emphatically professing before the jury that he had always stood ready and willing to reimburse the true owner if it was shown that he had in fact sold someone else's cattle.[35]

---

[35] Examples include the following exchange between Bennett and his counsel during his direct examination:

> Q:   Tom, have you always taken the position that if someone could show you that you had sold Randy Reynolds['s] cow or a calf or any combination that you were ready, willing, and able to pay?
>
> A:   I would have made it right anytime. If they would have showed me the pictures, I would have sat down a round table with anybody and made it right, yes, sir.

Further, Bennett introduced the following written statement he had given during his criminal investigation, dated February 2002:

39

### 1.  *Initial accusations against Reynolds*

As previously noted, following the January 2001 trial of Bennett's small claims court suit against Reynolds, Reynolds mentioned to Bennett that he was missing some cattle and asked if Bennett had seen them.  Bennett acknowledged that Reynolds did not accuse him at this time of *stealing* cattle.  Bennett's immediate response was to accuse Reynolds of stealing Bennett's cattle.  When reporting the alleged theft to the Sheriff, Bennett claimed that the cattle were black, later testifying that, contrary to other witnesses, "[m]ost of my cows were black."  None of Bennett's cattle were subsequently found on the Locker property.

### 2.  *Bennett offers to pay for evidence incriminating Reynolds*

Later, in August 2001, Hunter Hibler, who had worked for Reynolds several years earlier, testified that he received a call from Bennett, who was ostensibly interested in purchasing mesquite firewood that Hibler had been selling.  Bennett came to Hibler's house.  According to Hibler, "We talked about the trouble he and Randy had had with some fence they was trying to get built or had been built."  During that conversation, Hibler and Bennett agree that Bennett offered

---

In October 2000, Larry Grant and I rounded up a group of cattle on the Bennett Ranch in San Saba County.  I told Larry to cut out any cattle that were not mine and take the rest to the sale.  I immediately left for Corsicana Texas.  If Larry took any cattle to the sale that were not mine I will gladly pay for them.  At this time no one has given me any proof to show that the cattle were not mine.  I will be 65 this year and I have never been in trouble with the law.  If a mistake was made it was an honest mistake as I did not intend to sell cattle that were not mine.

Hibler $2,000 for assistance in implicating Reynolds in the theft of Bennett's cattle. The precise nature of Bennett's offer was disputed.

As Hibler described the $2,000 offer, "That was to try to get me to say that he had —Randy had took some of his cows out of his pasture." On cross-examination, Hibler admitted that Bennett had not asked him to make up facts, but to help him prove that Reynolds had taken some of his cows. Hibler testified that he declined the offer. Bennett, on the other hand, maintained that he had offered Hibler $2,000 to "[h]elp me prove it," that Hibler had agreed to help "[f]ind out about Randy stealing my cattle," and that the $2,000 was to be paid only if Hibler succeeded in finding evidence to convict Reynolds. Bennett explained, "I wasn't going to give him $2,000 for nothing."

Hibler testified that, at some point, he inquired with Reynolds about Bennett's allegation. Reynolds, according to Hibler, explained that he had merely recovered his own cattle from the Bennett Ranch. Hibler did not divulge that information to Bennett at the time.

### 3. *Bennett's response to the existence of the Grant photos*

During the evening of October 4, 2001, having learned that Reynolds would be contacting law enforcement regarding his photographs, Grant testified that he became concerned about his own role in the cattle sale, began drinking to relieve the tension, and made a series of phone calls during which he eventually became drunk.[36] At 9:22 p.m., he reached Ex Rogers, described as "[o]ne of Tom's friends," because "[b]asically we were friends and I was trying to find

---

[36] Grant also acknowledged the possibility that he had been smoking marijuana during the calls and that he had prior convictions for marijuana possession in 1993 and 1998.

41

where Tom was at." Grant and Rogers spoke for three minutes. According to Grant, he told Rogers "[t]hat I had some pictures and these cows didn't belong to Tom and I needed to get a hold of Tom."

Grant's next call, at 10 p.m., was to Bennett in Corsicana. Bennett answered, and the men spoke for thirteen minutes. Grant explained that he called Bennett "[b]ecause he said he would do right with the cows" back in 2000 when Grant had raised concerns about their ownership as the men were loading them for transport to auction. Grant tried to get Bennett to pay for them. Bennett, according to Grant, "pretended he didn't know" anything about the cattle. When Grant mentioned that he had pictures demonstrating they had been stolen, Bennett responded that "if I had any pictures give them to whoever wanted them," including law enforcement. At some point, Grant mentioned to Bennett that he had pictures and that Bennett could look at them, but "nobody was getting them."

Bennett, on the other hand, claimed that Grant threatened to blackmail him with the photos unless Bennett sent money, and that he had responded by refusing the offer and telling Grant to give the photos to law enforcement or whoever wanted them. Grant denied that he ever offered to sell the photos to Bennett or anyone else.

After hanging up with Bennett, Grant called Ex Rogers again, at 10:15 p.m. The phone records indicated a one-minute call, and Grant wasn't sure if they spoke at that time. At 10:16, Grant called Reynolds, and the two spoke for ten minutes, followed by a second call from Grant to Reynolds starting at 10:28 and lasting for five minutes. Reynolds recounted that during these calls or their earlier ones, he had assured Grant that he should cooperate with authorities and that if he did so, Reynolds would not press charges against him. Both Reynolds and Grant denied that Grant ever offered to sell Reynolds the photos or that Reynolds ever offered to pay or did pay

42

Grant for the photos. At trial, Bennett pointed to these calls as circumstantial proof that Reynolds and Grant had conspired against him after Bennett had dismissed Grant's alleged blackmail attempt.

At 10:45, Grant called Ex Rogers again and spoke for 17 minutes. Rogers testified that during his conversations with Grant, Grant had stated that he was offering to sell the photos to Bennett. Grant acknowledged that during his second conversation with Rogers, the men discussed the prospect of Bennett paying for the pictures, but "[j]ust jokingly," and that he had no intent to actually extort money from Bennett.

Two days later, Grant testified, he was contacted by Bennett, and Bennett came to his home in Coleman.[37] According to Grant, Bennett, in contrast to his statements over the telephone two days earlier, "told me to deny it to the end and nine times out of ten you won't have to worry about it."

In the weeks that followed, Grant claimed that Bennett attempted to contact him "[t]hirty or 40" times, often through "people who lived around me." Grant testified that he began avoiding Bennett.

*4.        Bennett's offers of financial assistance to Grant*

On or about January 5, 2002, Grant testified that he and his wife were in a serious car accident. Grant's sister, Debbie Maxcey, recounted that Grant's wife was in intensive care. Grant recalled that Bennett, possibly accompanied by Ex Rogers, came to see him again and offered him money, stating that "he wanted to help me because I was in a car wreck." Also, around that time,

---

[37] Roughly an hour to hour-and-a-half trip one-way.

Ms. Maxcey recalled, "I started receiving phone calls from Mr. Bennett wanting to get in touch with my brother." Ms. Maxcey responded "that it was not a good time, just to leave him alone." Bennett, according to Ms. Maxcey, "wanted to help out financially." Ms. Maxcey stressed that if her brother needed help, "it would be me or my mother would help him. Just leave him alone right now." Nevertheless, Ms. Maxcey maintained, Bennett "continued to call me off and on for probably a month, calling me two or three times a day at work. He came to my work, which I told him don't come back. I told him numerous times not to call me anymore."

During one of Bennett's calls, Ms. Maxcey claimed, Bennett stated that "I've got a job for him [Grant]. He said I'll pay him around [$]4,000" per week. By comparison, evidence of Grant's checks from his work at the Bennett Ranch reflected earnings of $1,100 per month.

Ms. Maxcey testified that during what ultimately was Bennett's last call to her, "he kept asking me—he said, I know he's [Grant's] got a cell phone, and I said okay. And for some odd reason," Ms. Maxcey continued, "I gave him my husband's cell phone number." Ms. Maxcey explained that she then called her husband, Mack, informed him that "I've given Tom your number; handle this for me." Mack agreed to do so.

Bennett testified that—despite his and Ex Rogers's claims that Grant had tried to blackmail him with the photos—he had genuinely wanted to help Grant after his accident, further pointing to various acts of his generosity while Grant worked on the Bennett Ranch.[38] Bennett

---

[38] These included paying Grant money when a child was born, selling Grant a car inexpensively, and loaning Grant's daughter an ATV for use on the Bennett Ranch. While acknowledging some of these acts, Grant also described less flattering behavior by Bennett toward his employees. *See infra* note 40.

denied offering Grant a $4,000 per-week job, stating that he instead merely relayed information about a potential job opportunity in the Corsicana area with an unspecified salary. Bennett explained his persistence in attempting to reach Grant as motivated by his desire merely to see the photos, ascertain whether or not the cattle depicted had belonged to him, and make good on his intention to rectify any "honest mistake."

### 5. "Ex's" call

Mack Maxcey, Jr., testified that during the first part of 2002, he received a call on his cell phone from a male who identified himself only as "Ex." Mr. Maxcey recounted that "primarily he just wanted to threaten me" with "bodily harm." Specifically, Mr. Maxcey testified that "he wanted to have a meeting' and if there was no meeting to be made, then he suggested some bodily harm might occur to me. And at the time, he thought I was [Grant]." According to Mr. Maxcey, he responded that Ex "needed to . . . quit talking and start the bodily harm." After "Ex" asked Mr. Maxcey to identify himself, Maxcey testified that "I told him that those that know me best call me 'sir.'"

Grant explained that Ex Rogers had been one of his co-workers at the Bennett Ranch and in Corsicana, who did "[j]ust whatever Mr. Bennett asked him to do." He described Rogers as "a Harley rider" who wore "[m]ostly gang member clothes, bandanas, beard, kind of hippie-type dude" with long hair. (Grant acknowledged that Rogers's appearance had since changed: by Bennett's 2003 criminal trial, Rogers had a bald head, no beard, and walked with a cane). Grant indicated that he feared Rogers because Rogers "always talked about cutting people from . . . ear bow to—all the way across" and "how bad he was and how he always tore people up."

45

Ex Rogers acknowledged having a phone conversation in which he had attempted to reach Grant to offer help following Grant's car wreck because he considered Grant a friend. He denied that Bennett had anything to do with the call.[39] Rogers recounted that he used the cell number that Grant had previously given him while they were working together. According to Rogers, he reached "[s]omebody else," who never identified himself, but "started cussing me." Rogers denied making any threats either during the call, terming Maxcey's contrary assertions a lie. He furthered denied ever threatening Grant, and that he wouldn't threaten his friend.

Rogers added that he had been on disability since 1996 and, while he did own a Harley and would wear some of the Harley regalia, denied he was in a gang, had tattoos, had ever been arrested, or had ever talked about cutting anyone in a fight. Rogers admitted, however, that he may have talked to Grant about fights he had been in. He also acknowledged having been involved in an incident in Mills County where he and Bennett had confronted an individual who had been claiming an easement through Bonham Corporation land and tearing down a fence. Rogers insisted that "I was out there to help Mr. Bennett rebuild that fence they had torn down." The record is unclear about the precise nature of this encounter, but Rogers acknowledged that the police were called.

### 6. *Bennett attempts to register the Rafter L brand*

Kim Wells, County and District Clerk of San Saba County, testified regarding an incident—though she could not recall the date or year—in which Bennett had come to her office and

---

[39] He also denied ever having traveled to Coleman to see Grant.

sought to register the Rafter L brand as his own. As County Clerk, Ms. Wells's duties including maintaining the San Saba County records of brand registrations. Ms. Wells recounted that she informed Bennett that the brand was registered to Reynolds. Bennett denied that he had ever attempted to register the Rafter L in his name, suggesting that Ms. Wells had confused an occasion where he had requested some certified copies of brand records. Ms. Wells, however, maintained that Bennett had been accompanied by counsel when requesting the certified copies, while Bennett had been alone when making a separate visit to register the Rafter L.

### 7. Bennett's attempts to prove his ownership of the cattle

We have previously reviewed the evidence Bennett presented to the jury that he, not Reynolds, owned all 13 cattle that he sold. The jury was able to assess the veracity of Bennett's interpretations of the cattle and brands shown in Grant's photos as compared to those of Reynolds and his witnesses (who included the Bay Maintenance ranch manager and a TSCRA brand inspector). Further, the jury heard Bennett's explanations of his enlargements depicting the "Bar-D" brand and could evaluate the credibility of his claims that the identical features appeared in PX-6 while enlarged images from the original negatives were being shown on an overhead projector in the courtroom. The jury could rely on this evidence, in turn, in evaluating Bennett's professions of "honest mistake" and his willingness to "make it right."

### Conclusion

We hold that the foregoing evidence, viewed in the light most favorable to the jury's finding, enabled a reasonable trier of fact to form a firm belief or conviction that Bennett's harm to

Reynolds resulted from malice.[40]  Regarding the information available to Bennett at the time the cattle were penned and loaded, the jury reasonably could have resolved the conflicting testimony between Grant and Bennett in favor of Grant's version—that Bennett was warned the 13 cattle did not belong to him and was even accused of being a "cattle rustler."  Further, in the face of Bennett's acknowledgments that he had been able to distinguish his own cattle from stray cattle on numerous occasions—including his claims of having culled out a bull and "curly-horned cow" at the time and, also in 2000, distinguishing the Carlisle cattle from his own—the jury reasonably could have disregarded Bennett's claims that "bad eyesight" prevented him from distinguishing his cattle from those belonging to others, especially given Bennett's close proximity to the cattle as they were penned and loaded.  Finally, relying on Grant's testimony and other evidence of the cattle's appearance and branding, the jury reasonably could have concluded that the 13 cattle did, in fact, look different from Bennett's cattle.  This evidence, at a minimum, could have allowed the jury to form a firm belief or conviction that Bennett's conduct in ordering the cattle sold, when viewed

---

[40]  In addition to this evidence, we note that the jury heard some testimony by Larry Grant in the nature of adverse character evidence against Bennett.  Grant claimed that, among other things, Bennett would compel ranch employees to make bets against their paychecks and then would cheat them to win the bets—including an instance when, according to Grant, Bennett and Grant cheated a mentally-retarded youth out of $1,500 and split the proceeds.  Grant also testified that Bennett cheated Grant's 12 year-old daughter on a bet over the length of a water hose, ordered a serial number ground off of a mobile home to conceal it from the tax assessor, had a two-way mirror in a Corsicana ranch shed that viewed into a ranch hand's bedroom, and regularly contrived ways to deprive departing employees of the amounts owed in their final paychecks.  Bennett emphatically denied these allegations, later terming Grant "the biggest liar [Reynolds] had on here."  The district court admitted much of this testimony after concluding that Bennett had opened the door by inquiring of Grant, "Now Tom treated you okay as a worker out there, did he not?"  Bennett does not complain on appeal of the court's admission of this evidence, and we must consider it to have been properly before the jury.  Nonetheless, we have based our legal and factual sufficiency analyses of the jury's malice finding solely on the evidence summarized above.

48

objectively from his standpoint at the time, involved an extreme degree of risk that the cattle belonged to someone else, that Bennett was actually aware of this risk, did not care, and proceeded anyway. *See Mobil Oil Co.*, 968 S.W.2d at 921.

We further hold that the evidence was sufficient to enable a reasonable jury to form a firm belief or conviction that Bennett had desired to sell, or believed that it was substantially certain that he was selling, cattle belonging to someone else. *See Reed Tool Co.*, 689 S.W.2d at 406. In addition to the evidence that Bennett was aware that the cattle did not belong to him, the jury could consider proof of Bennett's motives to sell the cattle despite that awareness. Specifically, the jury reasonably could have resolved the conflict between Bennett's and Monty Carlisle's versions of their encounter in favor of Mr. Carlisle's account. That account, along with the evidence of Bennett's behavior toward Reynolds in their fence-related dispute, is probative of a motive to force neighboring cattle operations and landowners—by legal or extra-legal means—to assume more of the financial burden of keeping their cattle off the Bennett Ranch.

Further supporting the jury's finding of specific intent was evidence of Bennett's behavior to avoid responsibility as the risk grew that his wrongdoing would be discovered. *See Transmission Exch. Inc.*, 821 S.W.2d at 273; *Bennett*, 572 S.W.2d at 760-61; *cf. King*, 29 S.W.3d at 565; *Ross*, 154 S.W.3d at 812. The jury reasonably could have resolved conflicts in the evidence to conclude (1) Bennett was aware that he had sold someone else's cattle in October 2000, (2) Bennett deduced from Reynolds's January 2001 inquiry about his missing cattle that the cattle must have belonged to Reynolds, (3) Bennett's immediate response was to deflect blame by attacking Reynolds in a manner calculated to confuse the issue of the cattle's ownership,

(4) Bennett thereafter offered to pay Hunter Hibler $2,000 to find evidence to convict Reynolds of cattle theft (though there is no dispute that Bennett didn't *explicitly* ask Hibler to make up facts, the jury reasonably could have drawn that implication in light of other evidence), (5) although initially feigning ignorance about the cattle sale when Grant called him about the photos, two days later Bennett urged Grant to "deny it to the end and nine times out of ten you won't have to worry about it," (6) Bennett thereafter persisted in repeatedly attempting to contact Grant directly or through neighbors or relatives, and Ex Rogers, Bennett's employee, attempted to threaten Grant if he did not agree to a meeting, (7) despite his claims that Grant had attempted to blackmail him, Bennett conveyed an offer of a $4,000 per week job, and (8) Bennett attempted to register the Rafter L brand as his own. Further, the jury could reasonably have inferred that Bennett's "enlargements" and trial testimony were not only false or fabricated, but wholly contrary to Bennett's professions of having made a mere "honest mistake" that he was willing to make right once his error was shown to him. As Reynolds's counsel inquired of Bennett, as Bennett persisted in defending his enlargements and his interpretations of Grant's photos, "It'd be pretty hard to convince you to pay Randy any money [for the cattle], wouldn't it?"

We also conclude that considering the evidence the jury reasonably could have found to be clear and convincing, the evidence is such that the jury could reasonably have formed a firm belief or conviction that Bennett had acted with specific intent or, at a minimum, with gross negligence. *Southwestern Bell Tel. Co.*, 164 S.W.3d at 609; *In re J.F.C.*, 96 S.W.3d at 266.

In contending otherwise, Bennett asserts that Reynolds "offered no other evidence as to any ill will or malice of [Bennett] toward [Reynolds]" beyond that concerning the

fence dispute; that Bennett "gave a written statement in which he stated that if any of the cattle were not his, he would pay for them, and that if a mistake was made, it was an honest mistake"; and that Grant admitted Bennett initially told him to take the photos to law enforcement or whoever wanted them. Bennett ignores much of the evidence we have surveyed above and urges us to credit disputed evidence that the jury reasonably could have disregarded. We overrule Bennett's third and fourth issues.

### *Bonham Corporation's liability*

Bonham Corporation remaining sufficiency-of-the-evidence challenges concern the two alternative liability theories that were submitted against it: (1) reverse alter-ego—whether the corporate form should be disregarded so as to make the corporation liable for Bennett's acts—and (2) agency principles. We need not address Bonham Corporation's challenges to the reverse alter-ego finding or submission because we conclude that the jury's findings against it under agency principles are supported by sufficient evidence and can alone support its liability.

The district court submitted whether Bonham Corporation, "either individually or through an agent, convert[ed] . . . cattle owned by Randy Reynolds." "Agent" was defined as "a person authorized by another to act for or in place of the other person or corporation and acting within the scope of his authority." Further, in the district court's submission of Bonham Corporation's malice, the jury was instructed that in order for Bennett's malice to be attributable to Bonham Corporation, it must find, by clear and convincing evidence, that either (1) the corporation "authorized the doing and the manner of the act," (2) the agent acting on behalf of Bonham Corporation was unfit and the corporation was reckless in employing him, (3) "Bennett was

51

employed in a managerial capacity and was acting in the scope of employment," or (4) Bonham Corporation or a manager of the corporation ratified or approved the act. Finally, in its submission of whether Bonham Corporation committed felony theft, the district court instructed the jury:

> If conduct constituting theft is performed by an agent acting in behalf of a corporation or association and within the scope of his office or employment, the corporation or association is criminally responsible for the theft only if its commission was authorized, requested, commanded, performed, or recklessly tolerated by a high managerial agent acting in behalf of the corporation or association and within the scope of his office or employment.

Because Bonham Corporation advances essentially the same arguments in challenging each of the jury's findings on these issues, and because the findings rest on the same evidence, we will consider the corporation's challenges to these findings together.

To summarize Bonham Corporation's arguments, it asserts there is insufficient evidence to support these findings because the evidence conclusively established (1) it is not in the cattle business, (2) any cattle operations on the Bennett Ranch are exclusively Bennett's personal concern, such that (3) Bennett's involvement in selling the cattle was beyond the scope of his agency authority or employment as Bonham Corporation president and not in behalf of the corporation. It also urges that—somewhat contrary to its concession of the jury's finding that Bennett "either individually or through an agent" converted cattle—because Larry Grant was an "independent contractor," the corporation cannot be held liable for his acts in delivering and selling the cattle on Bennett's behalf.

52

According to Bennett, Bonham Corporation was in the business of buying and improving land for later subdivision and resale.[41]   To that end, Bennett acknowledged, the corporation's activities on the Bennett Ranch included building fences, pens, and cattle guards, and irrigation.  Grant testified that his primary job was welding, and that he worked on fences, pens, cattle guards, and fixing farm and ranch equipment.  Bennett, as noted, testified that Bonham Corporation paid for the tearing down and replacement of the fence giving rise to the dispute with Reynolds, performing the work with corporation employees, using corporation materials and equipment.  Bennett added that when he later sued Reynolds in small claims court to recover a share of the fence's cost, he was intending to act as a representative of the Bonham Corporation rather than his own behalf.

Bennett distinguished these corporate activities from his cattle-raising on the Bennett Ranch.  Bennett testified that the Bonham Corporation owned no cattle, did not buy or sell cattle, and did not run a cattle operation.  Grant, in fact, agreed that the Bennett Ranch was not a cattle operation.  While there were cattle on the Bennett Ranch, Bennett explained that he owned those cattle in his own name, and that the corporation had merely permitted him to run those personal cattle on the property.  In evidence was a 1991 corporate resolution of Bennett's two daughters, as the corporate shareholders, authorizing Bennett, as president, to "transact business on behalf of the corporation . . . sign deeds, notes, deeds of trust, mineral deeds, royalty contracts, oil and gas leases,

---

[41]   As noted, the Bonham Corporation's articles of incorporation state its purposes as "construction and repair of buildings; development of property; and all related contracts permitted by law."

and all other legal papers and documents in the name of and on behalf of the corporation." The resolution added, "Also, he shall be entitled to run his personal livestock on any corporate land."

When Bennett would periodically sell cattle, he explained, he did so in his own name, always cashing the check—he did not have a personal bank account—and spending the funds on cattle purchases, feed, or other personal rather than corporate uses. Bonham Corporation points to the cattle sale at issue in this case as an illustration of this arrangement—the cattle were sold in Bennett's name, the check was payable to him personally, and Bennett cashed the check and claimed he spent it on cattle, feed, or other personal matters. Consequently, Bonham Corporation reasons, "[t]he fact that Mr. Bennett sold cattle either belonging to him or [Reynolds] referred to no duty owing by Mr. Bennett to [Bonham Corporation] and was not done in the discharge of any corporate duty or responsibility," and "[t]he record is void of evidence that Mr. Bennett in doing so was acting in behalf of [Bonham Corporation] or within the scope of his office or employment." We disagree.

We first note that the evidence conclusively establishes that Bennett was a vice-principal of Bonham Corporation. A "vice principal" encompasses certain types of corporate agents who represent the corporation in its corporate capacity, including corporate officers, "those who have authority to employ, direct, and discharge servants of the master," and "those to whom a master has confided the management of the whole of a department or division of his business." *Hammerly Oaks, Inc. v. Edwards*, 958 S.W.2d 387, 391 (Tex. 1997) (quoting *Fort Worth Elevators Co. v. Russell*, 70 S.W.2d 397, 403 (Tex. 1934)). When describing his authority on the Bennett Ranch, Bennett stated that "I make the decisions" and "I run that ranch." His duties, he explained, included hiring help on behalf of the corporation and telling the hires what to do. Bennett

54

also had authority to write corporate checks, and he regularly signed paychecks. Larry Grant testified that during his tenure, between 1997 and 2000, no one other than Bennett gave him orders. In contrast to the acts of ordinary employees for which a corporate principal may by held vicariously liable through respondeat superior principles, the acts of a vice principal like Bennett within his or her general authority and in furtherance of the employer's business are considered to be the acts of the corporation itself. *See GTE Southwest, Inc. v. Bruce*, 998 S.W.2d 605, 618 (Tex. 1999).

Bonham Corporation's proffered distinction between its corporate functions and Bennett's supposedly "personal" acts relating to the cattle sale is illusory at best. The jury heard Bennett characterize his right to run personal cattle on Bonham Corporation-owned land as a "lease" or "payment" for "tak[ing] care of [his] daughters' interests" as corporation president. In addition to this benefit, Bennett explained that he was allowed to live rent-free in corporation-owned houses on both the Bennett Ranch and the Corsicana property. Bennett received no monetary salary for his work as Bonham Corporation president. He did, however, garner some revenues from his cattle sales (although he insisted that his annual income, net of feed and other costs, had been so minimal that he had incurred no federal income tax liability—and had paid none—for approximately 20 years). Bennett emphatically denied that Bonham Corporation obtained any financial benefit from his cattle operations and rejected the suggestion that its revenues effectively substituted for an explicit president's salary.

Assuming a material distinction between Bonham Corporation's construction of cattle guards and fencing and Bennett's "personal" raising of cattle confined by those corporate assets, such a distinction implies nothing about the corporation's interests or Bennett's authority or duties

in keeping *others'* cattle out of the Bennett Ranch. Bonham Corporation largely overlooks this central flaw in its argument, instead asserting that Bennett was acting within his personal capacity because "[t]he great weight and preponderance of the evidence establishes that [Bonham Corporation] owned no cattle, was not conducting a cattle operation on the San Saba County property, *that the cattle were owned by Mr. Bennett*, the cattle were sold in the name of Mr. Bennett, and the check issued by the cattle auction was in the name of Mr. Bennett." (Emphasis added). We have already rejected this contention regarding the evidence of the cattle's ownership.

Bennett described his role as corporate president as "tak[ing] care of [his] daughters' interests" in the land. Bennett testified that it was Bonham Corporation's purpose to improve land for later resale. To that end, Bennett caused Bonham Corporation to spend thousands of dollars on fencing—including fencing along the Colorado, a feature many other area ranches lacked—and constructed cattle guards and pens. If, as Bennett suggests, the corporate fences and cattle guards had nothing to do with keeping his "personal" cattle confined within the ranch, the jury could reasonably have inferred that they served a corporate interest in keeping others' cattle or livestock off of the land it was attempting to improve. Further supporting this inference was evidence that San Saba County was governed by an open range law, that stray cattle were fairly common along the Colorado during dry periods, and the common knowledge of the property damage cattle can cause. For the same reasons, the jury reasonably could have inferred that Bennett's removal of stray cattle from the Bennett Ranch was in behalf of the corporation's interests and within the scope of his authority and duties as Bonham Corporation president.

Bennett, in fact, admitted that he was acting within his authority as president of Bonham Corporation when instructing Grant to haul the 13 cattle to auction:

Q:     You had the authority of the president of the James B. Bonham Corporation to tell Larry Grant to haul these cattle to town, didn't you?

A:     I told Larry Grant, when we cut those two heads out, I told him to take cattle to town, they belonged to me, and look them over and be sure that there wasn't anything else in there that wasn't mine before he took them. And I have him on tape saying that.

Q:     All right. You had the authority to say that to him?

A:     Yes, sir. I had the authority to tell him not to break the law and don't take cattle up there that wasn't mine.

Q:     He was a corporate employee, wasn't he?

A:     Yes, sir, at the time.

Q:     He was being paid by corporation checks, wasn't he?

A.     Yes, sir.

Q:     And you, as president of the corporation, had authority to tell him what to do on that day, didn't you?

A:     I didn't tell him to break the law, sir.

Q:     I know. But you just told the jury what you said you told him. And you had the authority to say what you said you told him, didn't you?

A:     Yes, sir.

Bennett further acknowledged that Grant hauled the cattle to auction with "[p]robably a corporation truck," pulling a trailer that Bennett claimed he owned personally but that bore a license plate for a

vehicle registered to Bonham Corporation.[42]   Grant added that he had previously taken cattle to auction at Bennett's direction ten or twelve times, that Bennett "[a]lways" made the decisions as to which cattle were to be sold, and that Grant had "[n]ever" made decisions regarding which cattle to be sold.  Finally, we note again that Bennett was personally involved in rounding up the 13 cattle, did not deny that he helped load the cattle, and directed two Bonham Corporation employees to assist him during the process.

Even if the jury credited Bennett's disputed assertion that he instructed Grant not to sell the cattle *illegally*, what matters in determining Bonham Corporation's liability is Bennett's general authority and duties to sell the cattle at all on behalf of the corporation.  *Cf. Celtic Life Ins. Co. v. Coats*, 885 S.W.2d 96, 99 (Tex. 1994) ("In determining a principal's vicarious liability, the proper question is not whether the principal authorized the specific wrongful act; if that were the case, principals would seldom be liable for their agent's misconduct.  Rather, the proper inquiry is whether the agent was acting within the scope of the agency relationship at the time of committing the act.").

Finally, Bonham Corporation suggests that the evidence establishes that Larry Grant—the ranch hand who hauled the cattle to auction—was acting as an independent contractor and that this should preclude its liability for selling the cattle.  Grant confirmed that the term "independent contractor" was used by Bennett to describe his arrangement with Bonham Corporation, but explained that this was Bennett's term only and that Bennett had the right to control

---

[42] Grant testified that if a vehicle they desired to use didn't have a current or valid license plate, Bennett would order him to switch a valid plate from another vehicle.  Bennett blamed the tag-switching practice on Grant alone.

the progress of his work and supervised him every day. Grant also noted that he did not own the welding tools and equipment he used on the Bennett Ranch, that he received a monthly paycheck, and that he had no other jobs. Further, Grant testified that when selling cattle, Bennett "[a]lways" made the decisions as to which cattle were to be sold, and that Grant had "[n]ever" made decisions regarding which cattle to be sold. The jury could have reasonably resolved the conflicting evidence regarding the scope of Grant's authority in favor of the jury's findings.

In sum, legally and factually sufficient evidence supports the jury's finding that Bonham Corporation, directly (through Bennett, its vice-principal) or through an agent (Grant), converted cattle belonging to Reynolds. The evidence, further, was legally and factually sufficient to enable the jury to form a firm belief or conviction that, at a minimum, (1) Bonham Corporation, through its vice-principal Bennett, "authorized the doing and the manner of the act"; and (2) "Bennett was employed in a managerial capacity and was acting in the scope of employment." Regarding the latter finding, although acts based purely on personal animosity are not within the scope of employment, *see Minyard Food Stores, Inc. v. Goodman*, 80 S.W.3d 573, 578-79 (Tex. 2002) (distinguishing defamation *to* one's employer for one's own purposes from defamation *for* one's employer), here the evidence was legally and factually sufficient to enable the jury to form a firm belief or conviction that Bennett's acts advanced the objective of "tak[ing] care of [his] daughters' interests" as corporate shareholders by recouping corporate fencing costs, ridding their property of stray cattle, and subsequently covering up the wrongdoing to prevent corporate exposure. *Cf. Long*, 821 S.W.2d at 273 (subsequent cover-up was probative of corporation's willful conduct through its general manager). For the same reasons, the evidence was legally and factually sufficient

59

to support the jury's findings that Bonham Corporation committed theft: Grant's acts in selling the cattle were in behalf of the corporation and within his scope of employment, and such acts were authorized, requested, and commanded by Bennett, a high managerial agent acting in behalf of the corporation and within the scope of his office or employment. We overrule Bonham Corporation's fourth, fifth, eighth, ninth, tenth, and eleventh issues.

**Constitutional challenges to punitive damages awards**

In the final issue brought by both appellants, both Bennett and Bonham Corporation assert that "the exemplary damages assessed by the jury are excessive and exorbitant." They rely exclusively on the due process principles reflected in *BMW of N. Am. v. Gore*, 517 U.S. 559 (1996), and its progeny. *See, e.g.*, *State Farm Mut. Auto Ins. Co. v. Campbell*, 538 U.S. 408 (2003); *Cooper Indus., Inc. v. Leatherman Tool Group*, *Inc.*, 532 U.S. 424, 431 (2001); *Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 307-08 (Tex. 2006).[43] The appellants emphasize the ratio between the punitive damages awards and actual damages—187.7:1 for Bonham Corporation and 46.9:1 for Bennett. Although acknowledging that "the U.S. Supreme Court has not drawn a bright line ratio which an exemplary damage award cannot exceed," each appellant points to the Supreme Court's observation in *State Farm* that "few awards exceeding a single digit ratio" will satisfy due process.

---

[43] Although Bennett and Bonham Corporation also invoke the protection for due course of law as guaranteed by the Article I, Section 19 of the Texas Constitution, they rely only on authorities under the federal Due Process Clause and do not attempt to advance any basis in the text, history or purpose of Article I, Section 19 as to why it would be in any material way different from its federal counterpart. Any argument to that effect is thus waived, and we will address these two protections together presuming that they are coextensive for purposes of our analysis. *See Texas Workers' Comp. Comm'n v. Patient Advocates*, 136 S.W.3d 643, 658 (Tex. 2004); *see also Texas Dept. of Transp. v. Barber*, 111 S.W.3d 86, 106 (Tex. 2003).

*State Farm*, 538 U.S. at 427.  Each argues that Reynolds "suffered only an economic loss [and] . . . no physical injury, mental anguish, pain and suffering, emotional distress, nor any other injury that would justify exemplary damages in an amount greater than nine times actual damages."

We begin our analysis of these contentions by noting their narrow focus.  First, the appellants do not challenge the excessiveness or exorbitancy of the punitive damages awards as a factual matter—i.e., the sufficiency of the evidence to support the awards under the charge as submitted to the jury.  *See Chapa*, 212 S.W.3d at 307-08.

Nor do the appellants challenge the form of the punitive damages submission.  The jury was asked to determine the amount of exemplary damages—defined as "an amount that [the jury] may in [its] discretion award as a penalty or by way of punishment"—that should be awarded "because the conduct of [Bennett and Bonham Corporation] "was committed with malice." The jury was instructed that, in determining any award, it was to consider each of the *Kraus* factors. *See Alamo Nat'l Bank v. Kraus*, 616 S.W.2d 908, 910 (Tex. 1981); Comms. On Pattern Jury Charges, State Bar of Tex., *Texas Pattern Jury Charges General Negligence, Intentional Personal Torts* PJC 8.6 (2006). Thus, we observe, the jury was explicitly required to consider evidence of "conduct" by each appellant that was not limited solely to the immediate sale of Reynolds's cattle, but also extended to evidence of their intent and subsequent attempts to cover-up their acts as it bore upon "[t]he nature of the wrong," "[t]he character of the conduct involved," "[t]he degree of culpability" of each appellant, "[t]he sense and sensibilities of the parties concerned," and "[t]he extent to which such conduct offends a public sense of justice and propriety."

61

Finally, the jury was explicitly instructed to consider, among the other *Kraus* factors, the net worth of each appellant. *Lunsford v. Morris*, 746 S.W.2d 471, 473 (Tex. 1988). During the punitive damages phase of trial, Bennett testified that the net worth on Bonham Corporation is "around $3 million," yet acknowledged that he had listed the San Saba County property alone for sale at $3 million, that the corporation owned thousands of acres in other counties, and that the corporation's most recent tax return stated over $4 million in assets. Jan Vanderburn of the San Saba County Tax Appraisal District testified that the market value of the corporation's San Saba County property was appraised at over $1.4 million.

Because Bennett and Bonham Corporation do not complain about the form of this submission, they have waived any complaint based on the procedural protections of the Due Process Clause. *Cf. Phillip Morris USA v. Williams*, __ U.S. __, 127 S. Ct. 1057, 1063-65 (2007) (sustaining preserved complaint that punitive-damages submission enabling jury to consider actual and potential harm to non-parties violated procedural protections of Due Process Clause); *cf. Harris County v. Smith*, 97 S.W.3d 230, 236 (Tex. 2002) (preserved complaint of error in charge that commingled valid and invalid damages theories).

Instead, Bennett and Bonham Corporation rely solely on what the United States and Texas Supreme Courts have termed the "substantive" limitations imposed on punitive damages awards by the Due Process Clause. *Campbell*, 538 U.S. at 418; *Chapa*, 212 S.W.3d at 307-08. These standards reflect recognition by the high courts that "[p]unitive damages may properly be imposed to further a State's legitimate interests in punishing unlawful conduct and deterring its repetition." *Campbell*, 538 U.S. at 416 (quoting *Gore*, 517 U.S. at 568). However, "[w]hile States

62

possess discretion over the imposition of punitive damages, it is well established that there are procedural and substantive limitations on these awards." *Id*. Specifically, "[t]he Due Process Clause of the Fourteenth Amendment prohibits the imposition of grossly excessive or arbitrary punishments on a tortfeasor" because "'elementary notions of fairness enshrined in our constitutional jurisprudence dictate that a person receive fair notice not only of the conduct that will subject him to punishment, but also of the severity of the penalty that a State may impose.'" *Id.* at 416-17 (quoting *Gore*, 517 U.S. at 574). Thus, "[t]o the extent an award is grossly excessive, it furthers no legitimate purpose and constitutes an arbitrary deprivation of property." *Id.* at 419; *see also id.* at 417-18 (quoting *Pacific Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 59 (1991) (O'Connor, J., dissenting) ("[T]he point of due process—of the law in general—is to allow citizens to order their behavior. A State can have no legitimate interest in deliberately making the law so arbitrary that citizens will be unable to avoid punishment based solely upon bias or whim.")).

To effectuate the "substantive" aspect of these limitations, the amount of a punitive damages award is "'subject to an ultimate federal constitutional check for exorbitancy,'" *Chapa*, 212 S.W.3d at 307 (quoting *Gaspirini v. Center for Humanities, Inc.*, 518 U.S. 415, 431 n.12 (1996)), in which three "guideposts" are considered: (1) the nature, or "reprehensibility," of the defendant's conduct, (2) the ratio between exemplary and compensatory damages, and (3) the size of civil penalties in comparable cases. *Campbell*, 538 U.S. at 418; *Gore*, 517 U.S. at 574-575; *Chapa*, 212 S.W.3d at 308. We observe that these "guideposts" are not ends in themselves—and do not merely substitute arbitrary appellate mechanisms for the perceived arbitrariness of juries—but are intended to illuminate our ultimate due process inquiry. *See Johansen v. Combustion Eng'g,*

*Inc.*, 170 F.3d 1320, 1335 (11th Cir. 1999) (describing "the essential legal issue [as] whether the relevant facts of this case, as indicated by the various *BMW* factors, constitutionally support the punitive damage award, i.e., do these facts indicate that [the defendant] had adequate notice that its conduct might subject it to this punitive damage award"), *cert denied*, 528 U.S. 921 (1999).[44] Whether a punitive damages award passes constitutional muster under this standard is a question of law that we review de novo. *Chapa*, 212 S.W.3d at 307.

### *Reprehensibility*

"The most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." *Campbell*, 538 U.S. at 419 (quoting *Gore*, 517 U.S. at 575). The Supreme Court has further instructed us

> to determine the reprehensibility of a defendant by considering whether: the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident.

*Id*. The existence of any one of these factors weighing in favor of a plaintiff may not be sufficient to sustain a punitive damages award, and the absence of all renders any award suspect. *Id*. Further,

---

[44] These standards, in part, compensate for the potential impact of any "evidence that has little bearing as to the amount of punitive damages that should be awarded" or "[v]ague instructions [that] do little to aid the decisionmaker in its task of assigning appropriate weight to evidence that is relevant and evidence that is tangential or only inflammatory." *Campbell*, 538 U.S. at 418.

It should be presumed that a plaintiff has been made whole for his injuries by compensatory damages, so punitive damages should only be awarded if the defendant's culpability, after having been paid compensatory damages, is so reprehensible as to warrant the imposition of further sanctions to achieve punishment or deterrence.

*Id.*

We are to consider reprehensibility not only in light of the harm actually caused to the plaintiff, but harm *potentially* caused to the plaintiff by the defendant's acts. *See Williams*, 127 S. Ct. at 1062, 1063; *Campbell*, 538 U.S. at 424; *see also TXO Prod. Co. v. Alliance Res. Corp.*, 509 U.S. 443, 460-62 (1993) (plurality op.). On the other hand, "[a] defendant's dissimilar acts, independent from the acts upon which liability was premised, may not serve as the basis for punitive damages," as "[d]ue process does not permit courts, in the calculation of punitive damages, to adjudicate the merits of other parties' hypothetical claims against a defendant under the guise of a reprehensibility analysis." *Campbell*, 538 U.S. at 422-23 (addressing role of evidence regarding defendant's alleged torts to third parties).

Here, as previously discussed, the jury's findings that the harm to Reynolds resulted from the malice of both Bennett and Bonham Corporation were supported by evidence not only that each appellant acted intentionally in converting and committing theft of cattle owned by Reynolds, but also that each attempted to cover-up the wrongdoing by numerous unlawful means extending to acts endangering the liberty and safety of Reynolds and others. Although the jury awarded only $5,327.11 in economic damages under Reynolds's conversion claim, the evidence supporting the jury's malice findings included appellants' attempts to implicate Reynolds in cattle theft—which

potentially could have landed Reynolds in prison[45]—and a threat of bodily injury intended for Grant. The evidence also included offers to pay witnesses and fabricated evidence and testimony. These acts were repeated over time—continuing even into the trial below—and were pervaded with intentional malice, trickery and deceit. Such actions evince a profound degree of reprehensibility.

Furthermore, the actions of Bennett and Bonham Corporation underlying the jury's malice finding go beyond merely implicating Texas's general policy interest in punishing and deterring tortious conduct through its civil justice system. They seek to undermine Texas's civil justice system itself. Such acts implicate Texas's more basic and fundamental state interests in preserving the integrity of its courts and the rule of law.

### The ratio

We turn now to the second guidepost, which requires us to compare the disparity between the punitive damages awards and the actual or potential harm suffered by Reynolds. *Campbell*, 538 U.S. at 424; *Gore*, 517 U.S. at 580; *Chapa*, 212 S.W.3d at 308. Bennett and Bonham Corporation emphasize that the jury awarded $5,327.11 in actual damages compared to $1 million in punitive damages against the corporation (a 187.7:1 ratio) and a $250,000 award against Bennett

---

[45] See Tex. Penal Code Ann. § 31.03(e) (West Supp. 2007) (classifying theft of "less than 10 head of cattle" as a "state jail felony" and theft of "10 or more head of cattle . . . stolen during a single transaction and having an aggregate value of less than $100,000" as a "felony of the third degree"), *see also id.* § 12.34 (West 2003) ("An individual adjudged guilty of a felony of the third degree shall be punished by imprisonment in the institutional division for any term of not more than 10 years or less than 2 years."), § 12.35 (West Supp. 2007) ("[A]n individual adjudged guilty of a state jail felony shall be punished by confinement in a state jail for any term of not more than two years or less than 180 days.").

(a 46.9:1 ratio). Although we must acknowledge that these ratios appear superficially dramatic, they overstate, in several ways, the relevant disparities between the awards.

Although the Supreme Court has noted that "few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process," the Court has repeatedly declined "to impose a bright-line ratio which a punitive damages award cannot exceed." *Id.* at 425. Significantly, the Court has recognized that "low awards of compensatory damages may properly support a higher ratio than high compensatory awards, if, for example, a particularly egregious act has resulted in only a small amount of economic damages." *Gore*, 517 U.S. at 582; *see also Campbell*, 538 U.S. at 425 ("[R]atios greater than those we have previously upheld may comport with due process where 'a particularly egregious act has resulted in only a small amount of economic damages.'" (quoting *Gore*, 516 U.S. at 585)). This is such a case. *See Johansen*, 170 F.3d at 1338-39 (upholding punitive damage award of 100 times greater than $43,500 actual damages; pointing to state's strong interest in deterring conduct in question—environmental pollution—by corporate tortfeasor and noting that plaintiffs had waived some compensatory damage claims to obtain injunctive relief); *see also Cooper v. Casey*, 97 F.3d 914, 919 (7th Cir. 1996) (a "mechanical ratio . . . would not make good sense. The smaller the compensatory damages, the higher the ratio of punitives to compensatory damages has to be in order to fulfill the objectives of awarding punitive damages."); *cf. Campbell*, 538 U.S. at 426 (holding $145 million punitive damages award unconstitutional where the compensatory award of $1 million "was substantial" and constituted "complete compensation"); *Williams v. Brown*, 352 F.3d 994, 1016 (5th Cir. 2003) (punitive damages ratio analysis "cannot be applied effectively in cases where only

67

[$100] nominal damages have been awarded" and to do so would effectively bar punitive damages altogether in such cases).

We also observe that because the $5,327.11 compensatory damages consisted solely of economic damages (the reasonable cash market value of the converted cattle), there is no danger that the punitive damages awards duplicated any punitive component of the compensatory award. *Cf. Campbell*, 538 U.S. at 425 (noting that the $1 million dollar compensatory award was "likely based on a component that was duplicated in the punitive award") (citing Restatement (Second) of Torts § 908, comment c., p. 466 (1977) ("In many cases in which compensatory damages include an amount for emotional distress, such as humiliation or indignation aroused by the defendant's act, there is no clear line of demarcation between punishment and compensation and a verdict for a specified amount frequently includes elements of both.")).

Furthermore, we again emphasize that our baseline for comparison is not only the actual damages in fact awarded by the jury, but also the *potential* harm likely to have resulted from the appellants' conduct. *See Williams*, 127 S. Ct. at 1062, 1063; *Campbell*, 538 U.S. at 424; *see also TXO Prod. Co.*, 509 U.S. at 460-62; *Tronzo v. Biomet*, 236 F.3d 1342, 1350 (Fed. Cir. 2001) (reduction in actual damages from $7 million to $250 on appeal, causing increase in punitive damages ratio from 2.8:1 to 38,000:1, was not a "substantial change in facts" enabling district court to revisit punitive damages on remand; court pointed to reprehensibility of acts and potential for high actual damages not reflected in award), *cert. denied*, 534 U.S. 1035 (2001). The potential harm to Reynolds from the appellant's actions, again, included loss of liberty from imprisonment, not to mention damage to reputation, mental anguish, and attorney's fees.

68

We need not address how such potential damages, as a general matter, should be quantified for purposes of the "ratio" guidepost[46] because Bennett admitted that such damages from being wrongfully accused of cattle theft would be substantial. Bennett counterclaimed against Reynolds for mental anguish, attorney's fees, and reputational damage arising from what he contended was "getting railroaded" in the "false" criminal prosecution against him. Bennett testified that he was seeking $15,000 in attorney's fees expended in regard to his criminal trial, plus, "[a]ll the jury would give me" for his mental anguish. When asked whether he'd take $500,000 for his mental anguish, Bennett responded, "That would be all right, yeah," and that he wouldn't feel bad about taking that amount "after what they put me through." If this estimate from Bennett's own testimony is credited as a baseline of potential harm from the appellants' actions, the ratios of punitive to actual damages would be less than 2:1 for Bonham Corporation and less than *0.5:1* for Bennett. More importantly, Bennett's testimony is significant as it bears on the notice concerns that are the ultimate focus of our due process analysis.

### *Comparable penalties*

Under the third guidepost, we compare the punitive damages awards to the civil penalties that could be imposed for comparable misconduct. *See Campbell*, 538 U.S. at 428; *Gore*, 517 U.S. at 583; *Tony Gullo Motors*, 212 S.W.3d at 308. In *Campbell*, the Supreme Court observed that it had also looked to the existence of criminal penalties for comparable conduct, as the existence of such penalties "does have a bearing on the seriousness with which a State views

---

[46] As Reynolds acknowledges, the jury did not find the amount of "potential" damages, only actual damages.

the wrongful action." *Campbell*, 538 U.S. at 428. Here, the conduct at issue entailed third-degree felony theft, *see* Tex. Penal Code Ann. § 31.03(e)(5)(A), as well as witness tampering. *See id*. § 36.05 (West 2003). In the criminal context, a person convicted of a third degree felony "shall be punished by imprisonment . . . for any term of not more than 10 years or less than 2 years." *Id*. § 12.34. Witness tampering is a state jail felony, *see id*. § 36.05, which is punishable "by confinement in a state jail for any term of not more than two years or less than 180 days." *See id*. § 12.35.

Although illustrating the seriousness with which a state views the wrongful action, "[w]hen used to determine the dollar amount of the award, however, the criminal penalty has less utility." *Campbell*, 538 U.S. at 428. Turning to comparable civil penalties, we note the Texas Legislature's policy choice to exempt conduct constituting third-degree felony theft from the caps otherwise applicable to punitive damages awards. *See* Tex. Civ. Prac. & Rem. Code Ann. § 41.008(c)(13) (West Supp. 2007) . In other words, barring contrary constitutional impediments, the legislature has deemed such conduct so serious as to remove the state statutory limitations otherwise restricting the amount of punitive damage awards for such conduct.

Further, we again emphasize that this due process guidepost, like the others, is ultimately an inquiry into whether the defendant has fair notice of the conduct that will subject him to punishment and the severity of the penalty. *Campbell*, 538 U.S. at 417 (quoting *Gore*, 517 U.S. at 574). Bennett admitted his actual awareness and belief that punitive damages were appropriate for wrongfully accusing another of cattle theft. Bennett acknowledged that he had sought punitive damages in his counterclaim (and had even sought them in his small claims court suit against

70

Reynolds), that he believed that punitive damages had a role to play in a civil lawsuit, and that he was requesting the jury to punish Reynolds with punitive damages merely for bringing his lawsuit and assisting in the criminal prosecution. On the other hand, Bennett testified that "I honestly don't know" a specific size of an award with which he wanted the jury to punish Reynolds.

### *Conclusion regarding punitive damages*

Applying the three "guideposts" to this somewhat unusual record before us, we conclude that the jury's punitive damages awards against both Bennett and Bonham Corporation do not violate due process. Specifically, the awards are not grossly excessive or arbitrary relative to Texas's legitimate (if not more fundamental or compelling) interests in punishing and deterring their malicious conduct as to reflect a lack of fair notice that their conduct would subject them to the penalties the jury ultimately imposed. *Campbell*, 538 U.S. at 417; *Johansen*, 170 F.3d at 1335. Simply put, Texans know better than to steal cattle and then attempt to subvert the legal system to cover their tracks, and can fairly expect that the legal system can (and must) impose severe penalties for such acts. We overrule Bennett's seventh issue and Bonham Corporation's twelfth issue.

## CONCLUSION

We affirm the district court's judgment in its entirety.

_____

Bob Pemberton, Justice

Before Justices Patterson, Pemberton and Henson

Affirmed

Filed:   December 21, 2007